(577 P.2d 357)
No. 49,138

State of Kansas, *Appellee,* v. Peter C. Jones, *Appellant.*

Opinion filed April 14, 1978.

*Brad T. Murphree,* of Arvin, Arvin and Busey, Chartered, of Wichita, for the appellant.

*Harold T. Pickler,* assistant district attorney, *Curt T. Schneider,* attorney general, *Vern Miller,* district attorney, and *Stephen M. Joseph,* assistant district attorney, for the appellee.

Before Foth, C.J., Abbott and Meyer, JJ.

Foth, C.J.: The defendant appeals from a conviction for bail jumping, *i.e.,* aggravated failure to appear under K.S.A. 21-3814.

The primary issue is whether entrapment is a defense to a criminal charge where (1) the officers claimed to have done the entrapping were known by the defendant to be officers, and (2) they accomplished their purpose solely by threats, without any deception or representations which would lead the defendant to believe the crime would not be detected or prosecuted. The trial court sustained a motion in limine by the state, ruling that evidence proffered in support of the entrapment defense was inadmissible. The defendant was convicted and now appeals. We affirm.

The defendant, Peter C. Jones, was originally charged on June 3, 1974, with possession of heroin, burglary, two counts of theft, and possession of a firearm after a felony conviction. After several continuances he failed to appear for his preliminary hearing scheduled for September 5, 1974, thereby forfeiting his appearance bond. When he did not surrender himself within thirty days, a complaint was filed in the present case. He was finally arrested in January, 1976, in California, and was brought back to Sedgwick County to stand trial in both cases.

The defendant's first trial on the bail jumping charge ended in a hung jury. At that trial the court allowed him to introduce evidence in support of the entrapment defense, and the court instructed the jury on entrapment. A second trial, where the court granted the state's pretrial motion in limine resulted in the present conviction.

At the hearing on the state's motion defendant's evidence was proffered through the statements of counsel and of the defendant himself. Testimony at the first trial was referred to, although it does not appear that a transcript was available. In any event the form of the proffer was deemed acceptable by the court and counsel. What defendant offered to show was a rather elaborate police scheme put in motion during the three months between his arrest and the time he absconded, allegedly designed to induce him to leave the jurisdiction. The proffer included testimony that:

1.  The police broke into his house on two occasions. (The prosecutor asserts they were executing search warrants.)

2.  He received two threatening notes. One said "If you are around by the first of September you are going to be a dead man." The second was a bereavement card, with a written message "Sorry to hear about your death."

3.  He received telephone calls asking if he received the second note. Defendant claimed to recognize the voice of the caller as that of a police officer he knew.

4.  There were knocks on his door at night, but when he answered no one was there.

5.  The police advised him there was a "contract" out on his life with a Kansas City, Missouri, assassin, and they were giving him twenty-four hour protection. This allegation, denied by police at the first trial, was corroborated at that trial by defendant's mother and sister and a television reporter, all of whom said the police had told them of the threat and protection.

6.  Three different officers told him he should leave town or he might be killed.

7. The idea of leaving hadn't occurred to him until the officers suggested it.

The question before us is whether defendant's evidence, accepted at face value, makes out a case of entrapment.

The defense of entrapment was unknown to the common law of

England, but developed recently in the common law of this country as a matter of public policy. The landmark case, firmly establishing that the defense is available in federal prosecutions, is *Sorrells v. United States,* 287 U.S. 435, 77 L.Ed. 413, 53 S.Ct. 210 (1932). That the defense is one to be delineated by each jurisdiction for itself, and not a matter of constitutional law, is settled by *United States v. Russell,* 411 U.S. 423, 36 L.Ed.2d 366, 93 S.Ct. 1637 (1973). Over the years most but not all states have adopted the defense in one form or another. See annotations, 18 A.L.R. 146, 66 A.L.R. 478, 86 A.L.R. 263.

The defense is most commonly encountered in prosecutions for violation of laws regulating material such as liquor, narcotics or obscenity, but the defense is not limited to those areas. In addition to the annotations cited above see 41 A.L.R.3d 418 (contempt); 10 A.L.R.3d 1121 (larceny); 77 A.L.R.2d 792 (obscenity); 75 A.L.R.2d 709 (fish and game laws); 69 A.L.R.2d 1397 (bribery); 55 A.L.R.2d 1322 (liquor); 53 A.L.R.2d 1156 (abortion); 52 A.L.R.2d 1194 (sexual offenses); 33 A.L.R.2d 883 (narcotics); and 31 A.L.R.2d 1212 (gambling).

In Kansas the defense was recognized even before the adoption of the 1970 Criminal Code. See, *State v. Wheat,* 205 Kan. 439, 469 P.2d 338 (1970); *State v. Reichenberger,* 209 Kan. 210, 495 P.2d 919 (1972). In *Reichenberger* the court recognized *Sorrells* as the primary source of guidelines for the defense, not only in the federal courts but also for "state courts in jurisdictions wherein the defense of entrapment is recognized." (209 Kan. at 215.) And in *State v. Houpt,* 210 Kan. 778, 504 P.2d 570 (1972), the court characterized our present statute as being, in essence, "merely a codification of what [the] court has said in *Reichenberger* and *State v. Wheat,* [supra]." (210 Kan. at 782.) That codification is as follows:

"**Entrapment.** A person is not guilty of a crime if his criminal conduct was induced or solicited by a public officer or his agent for the purposes of obtaining evidence to prosecute such person, unless:

"(*a*)  The public officer or his agent merely afforded an opportunity or facility for committing the crime in furtherance of a criminal purpose originated by such person or a co-conspirator; or

"(*b*)  The crime was of a type which is likely to occur and recur in the course of such person's business, and the public officer or his agent in doing the inducing or soliciting did not mislead such person into believing his conduct to be lawful." (K.S.A. 21-3210.)

The basis for recognizing the defense has been stated and restated many times in many different ways. In *Sorrells*, Chief Justice Hughes quoted approvingly from *Butts v. United States*, 273 F. 35, 38 (8th Cir. 1921):

"The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. Here the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief endeavor was to cause, to create, crime in order to punish it, and it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it. . . ."

The high court went on to quote from *Newman v. United States*, 299 F. 128, 131 (4th Cir. 1924):

". . . It is well settled that decoys may be used to entrap criminals, and to present opportunity to one intending or willing to commit crime. But decoys are not permissible to ensnare the innocent and law-abiding into the commission of crime. When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor. . . ."

The separate opinion of Justice Roberts, concurred in by Justices Brandeis and Stone, characterizes the defense this way:

"Society is at war with the criminal classes, and courts have uniformly held that in waging this warfare the forces of prevention and detection may use traps, decoys, and deception to obtain evidence of the commission of crime. Resort to such means does not render an indictment thereafter found a nullity nor call for the exclusion of evidence so procured. But the defense here asserted involves more than obtaining evidence by artifice or deception. Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer." (287 U.S. at pp. 453-4.)

In *Sherman v. United States*, 356 U.S. 369, 372-3, 2 L.Ed.2d 848, 78 S.Ct. 819 (1958), the Court observed that "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." The distinction depends in part on the previous state of mind of the defendant, or his "predisposition" to commit the crime. It is clearly recognized by the exceptions in our statute, *supra*, especially in subsection (*a*), referring to the defendant's origination of the criminal purpose.

In *State v. Houpt,* supra, our court expanded on this concept:

".   .   . The limitations on the conduct of an officer or his agent in subsection (*a*) that he 'merely afford an opportunity or facility for committing the crime' echoes what was said in *Reichenberger* relating to the conduct of officers or agents involved. In this connection we repeat our holding in *Reichenberger* that, in considering the facts relative to the issue of entrapment, it is essential to distinguish between a trap set for the unwary criminal and a trap set to ensnare the innocent and law abiding citizen. The valid purpose of the defense of entrapment is to protect the innocent from trickery or impermissible conduct on the part of a law enforcement officer or his agent so designed as to create a substantial risk that a person would [commit a crime] in the absence of criminal purpose to do so originating or previously existing in the mind of such person.   .   .   ." (210 Kan. at 782-3.)

The evidence proffered by defendant falls into two categories. First, there was evidence that he was harassed and threatened, either by the police or parties unknown. The trial court found that regardless of the source of the threats they were not a defense under the doctrine of *State v. Milum,* 213 Kan. 581, 516 P.2d 984 (1973). In that case the defendant sought to defend a charge of escaping from the penitentiary by showing that the deputy warden had threatened to have him killed if he didn't escape. The proffered defense was regarded as being "compulsion" under K.S.A. 21-3209(1), and was rejected by the trial court because the threat of harm was not "imminent" as required by the statute. The Supreme Court agreed.

The trial court here also relied on *United States v. Miller,* 451 F.2d 1306 (4th Cir. 1971), where evidence of threats upon the defendant's life was held not admissible when offered as a defense in a bail jumping case. The defendant's recourse, the court said, was to surrender to the authorities or seek protective measures rather than flee the jurisdiction.

Insofar as defendant's proffer here dealt with threats we agree with the trial court. *Milum* appears controlling (and *Miller* is persuasive) on the proposition that threats of future violence, even by the authorities, are not the kind of compulsion which will excuse the commission of crime.

That might end our discussion except that defendant correctly points out that the entrapment theory was not dealt with in *Milum.* Conceding that the threats did not amount to legal compulsion, he says the officers nevertheless put into his mind for the first time the idea of committing the crime. He argues that this is

enough to come within the terms of the statute, which speaks of criminal conduct "induced or solicited" by an officer.

As a matter of semantics and common understanding we believe the defendant is wrong. Webster says that to induce is to move or lead "as by persuasion or influence." (See, Webster's Third New International Dictionary.) As opposed to its synonyms "persuade" or "prevail," the word is said to indicate overcoming indifference, hesitation or opposition, "usually by offering for consideration persuasive advantages or gains." Thus, "inducements" are generally equated with rewards, and action is generally "induced" by the offer of positive gains, not by threats.

The same authority gives as its first modern meaning for "solicit" to "make petition to" and especially "to approach with a request or plea (as in selling or begging)." Included in the definitions is "to endeavor to obtain by asking or pleading." *All* definitions connote a request which may be refused; none include the concept of a threat.

We may concede that under some secondary definitions threats might be considered to be inducements or solicitations. We cannot believe the legislature intended to use the terms in such a strained sense, but we do not base our decision on dictionary definitions alone. At a more basic level we do not believe the police conduct alleged here comes within the underlying concept of the entrapment defense. The name itself, "entrapment," suggests some sort of covert activity resulting in a trap. A trap, we suppose, is something one enters unknowingly—known traps are avoided. Hence the reference in the quotations above to "ensnaring" the innocent and law-abiding, and to traps for the "unwary" innocent and the "unwary" criminal. In every one of the multitude of entrapment cases we have reviewed one of two types of deception was practiced: Either the officer or agent was operating under some sort of cover, pretending to be an ordinary citizen; or the entrapping agent pretended to be a co-conspirator or participant in the criminal activity whose silence could be counted on because of his self interest. The typical case of the first sort is the undercover agent who sets up a buy of liquor or narcotics; of the second sort, the co-worker who sets up a bribery or "pay-off" scheme. When the trap is sprung there is always the element of surprise at detection, and a sense of betrayal by one whom the defendant trusted.

Defendant cites us no case and we have found none where entrapment was considered an arguable defense under circumstances remotely resembling those present in this case. Defendant here claims that he knew those urging him to flee were officers. Further, there is no claim that they participated in the crime in any way, or led him to believe he could commit it with impunity. The result is that even if the idea originated with the officers, defendant went into the transaction with his eyes open. There is no reasonable way in which he can claim he was "entrapped."

To sustain the defense under these facts would have implications which strike us as unacceptable. First, it would undermine the rationale of *Milum;* threats of future harm by an officer would be a defense even though they did not amount to compulsion. The public policy reflected in the statute, as explicated in *Milum,* excuses criminal conduct only where the defendant reasonably deems it necessary to prevent a disaster which is about to happen. If there is time for reflection and a possibility of choosing an alternative, noncriminal method of preventing the threatened harm, society demands that the noncriminal course be pursued.

Second, our whole criminal code presupposes that an individual possesses a free will and is accountable for his rational conduct; the exceptions are few and narrowly drawn. *E.g.,* insanity is a defense only if *M'Naghten* standards are met (*State v. Smith,* 223 Kan. 203, 574 P.2d 548 [1977]); ignorance of the law or mistake are excuses under only limited circumstances (K.S.A. 21-3203); intoxication must be involuntary, and must produce a near-*M'Naghten* state, or it may be considered only on the issue of specific intent (K.S.A. 21-3208); compulsion, as discussed above, must in effect leave the defendant no realistic alternative to crime, and even then it does not excuse intentional homicide (K.S.A. 21-3209).

Entrapment, we think, must be similarly circumscribed. It cannot be a total defense to a criminal charge simply to say, "An officer suggested I do it." This defendant, when urged to leave town, was required to make up his own mind what course he would pursue. When, acting under no compulsion recognized by the law and suffering no delusions about the police attitude, he elected to jump his bond, he subjected himself to criminal liability. We therefore hold that defendant's evidence would not, as a matter of law, constitute entrapment even if believed, and the trial court did not err in rejecting it.

Since there was no evidence of entrapment before the jury, the trial court was not required to instruct on that defense. *State v. Jordan,* 220 Kan. 110, 116, 551 P.2d 773 (1976); and *cf., State v. Childers,* 222 Kan. 32, 563 P.2d 999 (1977).

Defendant also urges error in admitting various documents from the court file of the underlying felony charges. At worst these documents were cumulative, establishing in documentary form certain elements of the crime, *i.e.,* that defendant had been charged with a felony, that his bond had been forfeited, and when he was returned to custody. The state was entitled to prove its case in this way. *Cf., State v. Johnson,* 216 Kan. 445, 448, 532 P.2d 1325 (1975); *State v. Wilson,* 215 Kan. 28, 32, 523 P.2d 337 (1974).

Affirmed.