(623 P.2d 933)

No. 51,352

STATE OF KANSAS, *Appellee,* v. JEANNE P. GREENE, *et al., Appellants.*

Opinion filed February 13, 1981.

*Ira Dennis Hawver,* of Hawver & Irigonegaray, P.A., of Topeka, for the appellants.

*Phillip M. Fromme,* county attorney, and *Robert T. Stephan,* attorney general, for appellee.

Before FOTH, C.J., REES and MEYER, JJ.

FOTH, C.J.: The five defendants were among some thirty-five persons arrested on January 12, 1979, for their part in a peaceful protest demonstration near the site of the Wolf Creek nuclear power plant under construction in Coffey County. After a joint trial, they were each convicted by a jury of two misdemeanors: unlawful deprivation of property under K.S.A. 21-3705, and failure to obey the lawful order of a police officer under K.S.A. 8-1503. They were each fined $50.00 and costs, and they have appealed.

The case is presented on an agreed statement of facts under Rule No. 3.05 (225 Kan. xxxvii). Those facts material to issues raised include the following:

Defendants and their colleagues staged their protest on a county road where it was intersected by railroad tracks leading to the construction site. Kansas Gas and Electric Company, one of the owners of the power plant project, had an easement across the road at this point and owned the railroad. As a train bearing a nuclear core vessel approached the road the protesters joined hands and marched in a circle, each momentarily passing and repassing over the tracks, but always staying on the county road. The marching was accompanied by the chanting of protest slogans. These maneuvers effectively brought the train to a halt, which lasted about two hours.

While the marching and chanting were going on the Coffey County Sheriff approached with a bullhorn. From a short distance away he made the following announcement:

"I have been requested by a representative of the owners of this property to ask you to leave. You are trespassing on private property without permission of the owners. You will have sixty seconds to leave the railroad tracks without being arrested. If you remain on the tracks you will be arrested and prosecuted for criminal trespass."

In due course the protesters were forcibly (but without resistance) removed from the road by various peace officers.

Defendants were originally charged with criminal trespass. A week before trial the charge was amended to eliminate that offense and to include those of which defendants were convicted. On appeal defendants complain of the trial court's refusal to give requested instructions and question whether their conduct constituted a violation of the statutes under which they were charged and convicted.

## I. THE COMPULSION DEFENSE

Their first claim, going to both offenses, involves the trial court's refusal to instruct the jury on the defense of "compulsion," as set forth in K.S.A. 21-3209(1):

"A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct."

In their brief appellants claim their defense counsel informed the trial court that expert testimony was available to demonstrate that "imminent" harm could occur "from the arrival of the reactor core vessel [at the Wolf Creek nuclear power plant]." No offer of proof or description of its substance appears in the record. The record does show that no operational permit had been granted by the federal Nuclear Regulatory Commission, and no radioactive fuel was present at the site. Thus, even assuming danger from a nuclear power plant, there could have been no threat of "imminent" death or great bodily harm as required by the statute. See *State v. Milum,* 213 Kan. 581, 516 P.2d 984 (1973); *State v. Jones,* 2 Kan. App. 2d 220, 577 P.2d 357 (1978).

There is, however, another reason why the defense was not available. The defense, where available, justifies any crime short of homicide. If nuclear power presents the kind of threat to life and health contemplated by the compulsion statute, then if and when the Wolf Creek plant becomes operational those who reasonably feel threatened by its presence would be legally justified in destroying it—by explosives or any other means available. We cannot believe our legislature intended any such result.

The legislature has established a statutory scheme for the development and use of nuclear power. See K.S.A. 48-1601 *et seq.* If the compulsion defense were available to those who disagree with that policy, then jurors in cases like this would have to decide on a case-by-case basis whether the defendants' beliefs in potential harm were reasonable. That result would transfer from the legislature to random groups of citizens the task of weighing nuclear power's benefits against its potential for harm. Yet the legislature, as noted, has already spoken. We are not concerned with the wisdom of the present legislative policy on the subject; we do conclude that such a policy decision is for the people's elected representatives and not for jurors in individual cases.

The compulsion defense has, to our knowledge, been raised in three cases involving nuclear power protests. It has been rejected in all three. The statement which best epitomizes our reasoning is found in *State v. Dorsey,* 118 N.H. 844, 846, 395 A.2d 855 (1978):

"Nor were matters of this sort contemplated under the common-law defense of necessity. The common-law defense dealt with imminent dangers from obvious and generally recognized harms. It did not deal with nonimminent or debatable harms; nor did it deal with activities that the legislative branch of government had expressly sanctioned and found not to be harms. *See* G. Williams, Criminal Law: The General Part § 232, at 729 (2d ed. 1961) and cases cited therein. To allow nuclear power plants to be considered a danger or harm within the meaning of that defense either at common law or under the statute would require lay jurors to determine in individual cases matters of State and national policy in a very technical field. Competing factions would produce extensive expert testimony on the danger or lack of danger of nuclear power plants, and jurors in each case would then be asked to decide issues already determined by the legislature."

*State v. Warshow,* 138 Vt. 22, 410 A.2d 1000 (1979), is a similar case. The majority reasoned:

"There is no doubt that the defendants wished to call attention to the dangers of low-level radiation, nuclear waste, and nuclear accident. But low-level radiation and nuclear waste are not the types of imminent danger classified as an emergency sufficient to justify criminal activity. . . .

"Nor does the specter of nuclear accident as presented by these defendants fulfill the imminent and compelling harm element of the defense. The offer does not take the position that they acted to prevent an impending accident. Rather, they claimed that they acted to foreclose the 'chance' or 'possibility' of accident. This defense cannot lightly be allowed to justify acts taken to foreclose speculative and uncertain dangers. Its application must be limited to acts directed to the prevention of harm that is reasonably certain to occur." 138 Vt. at 25.

Justice Hill, concurring, added:

"Determination of the issue of competing values and, therefore, the availability of the defense of necessity is precluded, however, when there has been a deliberate legislative choice as to the values at issue. [Citations omitted.] The common law defense of necessity deals with imminent dangers from obvious and generally recognized harms. It does not deal with non-imminent or debatable harms, nor does it deal with activities that the legislative branch has expressly sanctioned and found not to be harms." 138 Vt. at 27.

Finally, in *United States v. Best,* 476 F. Supp. 34 (D. Colo. 1979), the defendants were arrested for trespassing on nuclear power plant property. The court set forth the following statement on the use of the compulsion defense:

"Among other things, the proffered evidence will have to show:

"1. A direct causal relationship between the defendant's actions and the avoidance of the perceived harm. . . .

"2. The act to be prevented by defendant's conduct was criminal . . . .

"3. The alleged criminal act which defendants wanted to stop was one occurring in their presence, and was one which would subject them to immediate harm which a reasonable man would think could be eliminated by defendants' conduct. . . .

"4. There was no alternative available to defendants to accomplish their purpose which did not involve a violation of the law." 476 F. Supp. at 48.

Thus, to the tests recognized elsewhere the court added a requirement that the conduct sought to be prevented be itself criminal. Assuming, without deciding, that only danger from criminal conduct can amount to compulsion, defendants here cannot reasonably claim the delivery of the reactor core constituted a criminal act.

We conclude that the requested instruction on compulsion was properly rejected.

## II. UNLAWFUL DEPRIVATION OF PROPERTY

The defendants' second contention is that the statute describing unlawful deprivation of property does not cover defendants' admitted conduct.

K.S.A. 21-3705 provides in relevant part:

"Unlawful deprivation of property is obtaining or exerting unauthorized control over property, with intent to deprive the owner of the temporary use thereof, without the owner's consent but not with the intent of depriving the owner permanently of the possession, use or benefit of his property."

K.S.A. 21-3705 contains four basic elements: (a) obtaining or exerting unauthorized control; (b) over property; (c) with the intent to deprive the owner of the temporary use thereof; and (d) without the owner's consent.

Starting with the second element, the question is whether K. G. & E.'s "property" was within the statute. That property was an easement over which the railroad tracks had been laid and the tracks and other components of the railroad bed.

The Judicial Council advisory comment to the statute states:

"The section represents an expansion of the former 'joyriding' statute, former K.S.A. 21-544, *to include all classes of property.*" Emphasis added.

Accord, author's comments, Vernon's Kansas Crim. C. § 21-3705 (1971).

In addition, K.S.A. 1980 Supp. 21-3110, the definition section of the criminal code, provides:

"(16) 'Property' means *anything of value, tangible or intangible, real or personal.*" Emphasis added.

We conclude that the temporary deprivation statute covers real estate as well as personal property. See Wilson, *Thou Shalt Not Steal: Ruminations on the New Kansas Theft Law,* 20 Kan. L. Rev. 385, 407-8 (1972), where the author reaches the same conclusion as to the scope of K.S.A. (now 1980 Supp.) 21-3701, our theft statute, which also applies to "property." Hence the common law classifications of realty and personalty are irrelevant; it was enough on this element that K. G. & E. lost the use of "property."

On the third element, "intent," it is not disputed that defendants deliberately blocked the railway, thus denying its owners the use thereof, *i.e.,* access to the track from and beyond the point where defendants staged their protest, and for a temporary period of time. As to the fourth, "consent," nothing in the record suggests permission from the railway owners; the sheriff's order to leave, made at K. G. & E.'s request, is a clear expression of K. G. & E.'s lack of consent.

The only possible question is on the first, *i.e.,* whether the control defendants exercised over the railway was "unauthorized."

That term is not defined in K.S.A. 1980 Supp. 21-3110 as are many of the commonly used terms found in the criminal code. However, as Professor Wilson observes:

"[T]he term is one of common understanding, and in the context of a penal statute it can only mean 'without lawful authority.' As the Illinois Court of Appeals has pointed out: '[T]he concept of unauthorized control has no legal or technical meaning distinct from its popular acceptation. To exert unauthorized control means control exercised over property of another without the consent of the owner.' " Wilson, 20 Kan. L. Rev. at 395.

The quotation is from *People v. Bullock,* 123 Ill. App. 2d 30, 33, 259 N.E.2d 641, 643 (1970), construing similar language in the Illinois code from which our code was adopted.

Under such a definition defendants' control over K. G. & E.'s property was "unauthorized." However, defendants make one additional argument on this element, based on the fact they never left the county road. They say they, as members of the public, had a right to be there, and therefore could not be guilty of an offense for merely exercising that right. Their action, they say, was "authorized" by law even though not by K. G. & E.

In their brief, defendants assert that they and K. G. & E. had "mutual and reciprocal" rights to use the intersection. We agree. *Cf. Tennis v. Rapid Transit Rly. Co.,* 45 Kan. 503, 506-7, 25 Pac. 876 (1891). The trouble is, defendants were for the time being asserting an *exclusive* right to use the intersection, in derogation of the "mutual and reciprocal" right of K. G. & E. Further, the public's right to use of the public highway is for travel. 39 Am. Jur. 2d, Highways, Streets, and Bridges §§ 192, 193. Defendants' use here was not for travel but for the admitted purpose of preventing K. G. & E. from exercising its coequal right of use. Defendants' legal right to use the road for travel did not "authorize" them to deliberately deprive K. G. & E. of its use of its property.

We conclude that defendants' conduct contained each element of the crime and they were properly convicted of unlawful deprivation of property.

III. REFUSAL TO COMPLY WITH ORDER OF A POLICE OFFICER

Defendants also contend their conduct did not amount to a violation of the charge framed under K.S.A. 8-1503. We agree.

The statute provides:

"No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer or fireman invested by law with authority to direct, control or regulate traffic."

It is part of the "uniform act to regulate traffic on highways," (L. 1974, ch. 33) and is found in Article 15, entitled *Rules of the Road.* The statute is manifestly intended to facilitate the regulation of traffic—hence the requirement that the order violated be one given by an official "invested by law with authority to direct, control or regulate traffic."

The thrust of the statute is that where one is violating some traffic law on a public street or highway, or where circumstances necessitate that an official so authorized regulate and direct traffic, the officer's orders must be obeyed. We do not read the statute as encompassing orders of a police officer or fireman not directed toward the regulation of traffic, even though "lawful." Thus, a police officer's command to a thief to stop, or a fireman's order to remove flammable material from a building, do not come under the statute as we construe it. That is true even though both may be "lawful" orders, and both types of officials may be authorized to direct traffic. In neither case is the official engaged in directing

traffic when the order is given, and the order given has no connection with the control of traffic. Failure to comply may violate *other* statutes, but not this part of the traffic code.

In this case the sheriff's order on which the charge was based was specifically predicated on defendants' alleged trespass on private property. The announcement was said to be made at the request of the property owner, advised defendants they were trespassing, and threatened prosecution for trespassing if defendants did not comply. The order which defendants violated cannot reasonably be construed as a traffic control direction. Construing the statute according to its manifest purpose, and narrowly against the State, we cannot extend it to cover the order given here. Accordingly, the conviction on this count cannot stand.

In view of what has been said we need not consider defendants' other arguments on this point.

The judgment is affirmed as to the count charging unlawful deprivation of property and reversed as to the count charging failure to comply with the order of a police officer. Since the agreed statement does not show the allocation of the fine imposed, the case is remanded to the district court with directions to discharge defendants on the latter count and remit the fine allocable thereto.