NOT DESIGNATED FOR PUBLICATION

No. 121,354

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GARY O. INGRAM JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed August 28, 2020. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., GREEN and BUSER, JJ.

PER CURIAM:  Gary O. Ingram Jr. appeals his felony conviction for criminal deprivation of a motor vehicle in violation of K.S.A. 2018 Supp. 21-5803(a), (b)(1)(A)(ii). He contends the trial evidence was insufficient to support his conviction for two reasons. First, Ingram argues that the State failed to prove that he exerted unauthorized control over the vehicle or that he intended to temporarily deprive the owner of the ability to use the vehicle. Second, he claims that insufficient evidence supports the status of his crime as a felony offense because the State failed to present evidence of his prior convictions that rendered his crime a felony offense. Upon our

1

review, we hold that sufficient evidence supports Ingram's felony conviction of criminal deprivation of a motor vehicle. The conviction is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 2018, a salesperson at Don Hattan Chevrolet allowed Ingram to take a 10- to 20-minute test drive of a Volvo SUV. Ingram never returned the vehicle to the dealership. Police were called the next day and the SUV was reported as stolen. Three days after the vehicle was reported stolen, an officer located the SUV with two female occupants inside. Ingram was not present when the vehicle was recovered.

The State charged Ingram with felony criminal deprivation of a motor vehicle in violation of K.S.A. 2018 Supp. 21-5803(a), (b)(1)(A)(ii), with an alternative charge of felony theft. While criminal deprivation of a motor vehicle can be a misdemeanor offense, the crime is upgraded to a felony upon a defendant's third or subsequent conviction. K.S.A. 2018 Supp. 21-5803(b)(1)(A). At the preliminary hearing, the district court admitted into evidence certified journal entries showing that Ingram had two prior convictions for criminal deprivation of a motor vehicle. Noting these journal entries, the district court bound Ingram over on felony criminal deprivation of a motor vehicle. The case proceeded to a jury trial.

At trial, Donald Shaw, a sales manager at Don Hattan Chevrolet, testified that on July 23, 2018, Ingram came into the dealership and said he needed a new truck for his trucking company. Shaw informed Ingram that he would need to provide a year or two of tax returns to obtain a commercial loan. However, Ingram was unable to provide any tax documents that showed income from his business. Ingram looked at numerous vehicles. Shaw processed a credit application which revealed that Ingram had a low credit score. Shaw advised Ingram that because of his low credit score and lack of business documentation, he should look for vehicles valued between $10,000 and $14,000. Ingram

2

expressed interest in looking at those vehicles but left because the dealership had closed for the day.

After Ingram left the dealership, he called Shaw and discussed purchasing a truck. The conversation was brief, and Shaw explained to Ingram that he would not be able to get a sizable loan. The phone call, however, allowed Shaw to obtain Ingram's phone number.

The next morning, Ingram returned to the dealership and met with intern-salesperson Tucker Sweely. Shaw was not at the dealership because he had the day off. Like the previous day, Ingram told Sweely that he was looking for a new truck for his business. This time, however, Ingram brought a stack of papers and pictures of trucks attempting to validate his trucking business. Initially, Ingram and Sweely looked at several new trucks. After learning that Ingram had spoken with Shaw the previous day, Sweely called Shaw. Shaw explained that Ingram needed to look at less expensive vehicles because of his low credit score.

After the conversation with Shaw, Ingram and Sweely looked at used vehicles. About an hour and a half later, Sweely spoke with a manager about getting a deal made with Ingram. At that point, Ingram inquired about a Volvo SUV in front of the dealership worth about $11,000 to $12,000. Sweely checked with his manager and they agreed to let Ingram take the SUV on a test drive.

Before leaving on the test drive, Ingram was required to provide identification. Ingram gave a photocopy of his driver's license, which Sweely believed was valid. Sweely made a copy of Ingram's photocopy, gave Ingram a dealer tag, and let him take the SUV for a test drive. Sweely told Ingram that he expected the vehicle back in 10 to 20 minutes.

3

About 30 minutes after Ingram began the test drive, Sweely called Ingram and asked when he would return. Ingram explained that he was at a bank to get financing approved. Sweely asked Ingram how long it would be before he returned the vehicle, and Ingram responded that he would be back "sooner than later." After another hour passed, Sweely called Ingram again. Ingram said he was still at the bank and had to run a couple of errands before he would return with the vehicle. More time passed and Ingram still had not returned with the vehicle, so Sweely called again. This time, however, Sweely's call went directly to Ingram's voicemail. Sweely made subsequent attempts to reach Ingram, but each time the call would go to voicemail.

By the end of the day, Sweely had called Ingram about 10 times. Sweely left several voicemail messages explaining that Ingram needed to bring the vehicle back otherwise the police would be involved. Shaw, who was informed of the situation, also called Ingram and left numerous messages demanding that he bring the SUV back to the dealership. Despite these repeated messages, Ingram did not return to the dealership with the vehicle. In the evening, about 9 or 10 p.m., Shaw received a call from an unknown phone number, but he determined the caller was Ingram. The phone call was confusing, but Shaw believed that Ingram was attempting to explain that there was a fight at a gas station, and something happened to the SUV.

The following morning, July 25, 2018, Sweely and other managers began calling Ingram and leaving messages that the police would be called if he did not return the vehicle. However, Ingram did not return the SUV and it was reported as stolen. Officer Gary Palmer handled the offense report. He attempted to contact Ingram but was unable to locate him or the SUV that day. Officer Palmer listed the vehicle as stolen.

Four days later, on July 29, 2018, Officer Christopher Willis responded to a report of a suspected drug transaction taking place at a gas station between occupants of a blue vehicle and a Volvo SUV. Upon checking the dealer tag and VIN number on the SUV,

4

the officer discovered the vehicle had been reported stolen. Ingram was not present when Officer Willis discovered the vehicle. Instead, two women, Chancie Greeno and Amanda Cole, were inside the SUV.

At trial, Ingram testified on his own behalf, explaining that he owned a business leasing trucks and freight vehicles. Ingram acknowledged that he went to Don Hattan Chevrolet on the evening of July 23, 2018, and returned to the dealership the following morning. Ingram testified that after looking at several vehicles, Sweely encouraged him to consider the SUV. Although skeptical, Ingram decided to test drive the vehicle.

According to Ingram, he left the dealership at 11 a.m., filled the vehicle with gas, and then drove to his bank to discuss financing. Ingram testified that Sweely called him while he was at the bank and told him to return the vehicle once he had completed his errands. Ingram told Sweely that he was picking somebody up on his way to return the vehicle. According to Ingram, after the phone call, he left the bank and picked up Greeno, who needed a ride to an address near the dealership. Ingram and Greeno then went to a "family's friend's house" for a while. Ingram drove to a gas station to fill up the SUV before returning it to the dealership.

Ingram testified that he went inside the gas station to pay for gas and buy cigarettes while Greeno was still in the vehicle. Ingram claimed that while inside the gas station, he saw Greeno drive off in the SUV. Ingram then asked the person standing next to him, whom Ingram believed was Deputy Ortega of the Sedgwick County Sheriff's Department, to give him a ride to catch the vehicle. According to Ingram, the SUV was pursued but the two men were unable to stop the vehicle.

Ingram testified that within an hour of the theft, he called Shaw to inform him that the SUV had been stolen. Ingram claimed that he told Shaw that he would do whatever he could to help get the vehicle back. Ingram explained that since his cell phone and

wallet were in the SUV, he used Deputy Ortega's phone to call Shaw. Ingram conceded that he never reported to the police that the SUV, his wallet, or his cell phone were stolen, and he never checked with the dealership to see if his phone or wallet were recovered.

In rebuttal, the State presented evidence from Shaw, who testified that Ingram did not mention the SUV was stolen during the phone call on July 24, 2018. Instead, Ingram told Shaw that there was a fight and "the girls took the vehicle." Shaw also refuted Ingram's claim that he offered to assist in the recovery of the SUV.

At the close of evidence, the State dismissed the alternative charge of theft and elected to proceed only on the criminal deprivation of a motor vehicle charge. The jury found Ingram guilty of criminal deprivation of a motor vehicle. He was sentenced to 11 months in prison. Ingram filed a timely appeal.

ANALYSIS

On appeal, Ingram contends there was insufficient evidence presented at trial to support his felony conviction of criminal deprivation of a motor vehicle. Ingram's argument is two-fold. He first claims the State failed to prove all the essential elements of criminal deprivation of property beyond a reasonable doubt. Next, Ingram asserts that the State failed to prove that his crime was a felony offense.

We begin the analysis with a statement of our standards of review. When the sufficiency of evidence is challenged in a criminal case, our court reviews all evidence in the light most favorable to the State. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). The conviction will be upheld if we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt based on that evidence. 307 Kan. at 668. In determining whether there is sufficient evidence to support a conviction, an appellate court generally will not reweigh the evidence or reassess witness credibility.

6

307 Kan. at 668. And a verdict may be supported by circumstantial evidence if that evidence provides a basis for a reasonable inference by the fact-finder on the fact in issue. To be sufficient, circumstantial evidence need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

To the extent this issue involves questions of statutory interpretation, we exercise unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019). We must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Ayers*, 309 Kan. 162, 163-64, 432 P.3d 663 (2019).

*Elements of Criminal Deprivation of Property*

The jury found Ingram guilty of criminal deprivation of property under K.S.A. 2018 Supp. 21-5803(a), which defines the crime as "obtaining or exerting unauthorized control over property, with intent to temporarily deprive the owner of the use thereof, without the owner's consent but not with the intent of permanently depriving the owner of the possession, use or benefit of such owner's property." In accordance with PIK Crim. 4th 58.080 (2013 Supp.), the jury was instructed that the elements of the charged crime were:

> "1. Don Hattan Chevrolet, Inc. was the owner of the property in question.
> "2. The defendant exerted unauthorized control over the property without the owner's consent.
> "3. The defendant intended to temporarily deprive the owner of the use or benefit of such owner's property.
> "4. The property was a motor vehicle.

"5. This act occurred on or between the 24th and 25th day of July 2018, in Sedgwick County, Kansas."

Ingram does not contest that Don Hattan Chevrolet owned the property in question or that the property was a motor vehicle. He also admits that the taking of the SUV occurred in Sedgwick County. Ingram's claim of error is that the State failed to provide sufficient evidence that he exerted unauthorized control over the vehicle or that he acted with "criminal intent" when he intended to temporarily deprive the owner of the use or benefit of the vehicle.

While K.S.A. 2018 Supp. 21-5803 does not define the phrase "unauthorized control," our court has noted that the phrase has no technical definition outside of its common understanding and means "'control exercised over property of another without the consent of the owner.'" *State v. Greene*, 5 Kan. App. 2d 698, 703, 623 P.2d 933 (1981). Ingram argues that he never had unauthorized control of the vehicle because he had permission to test drive the vehicle and no longer had possession of the vehicle by the time dealership employees were demanding its return.

We are convinced the State presented sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Ingram exerted unauthorized control over the SUV without the owner's consent. Sweely testified that he told Ingram before the test drive that he expected him to return the vehicle within 20 minutes. Ingram did not return the SUV within that time period and, instead, admitted spending additional time going to a bank without the consent of a dealership employee. Sweely testified that he called Ingram for the second time at 1 p.m., and Ingram said he would return the SUV after completing a couple errands. Ingram testified that he was walking out of the bank when Sweely made this call. But instead of returning the SUV shortly after completing some errands, Ingram admittedly spent the next few hours picking up a friend and socializing at a family friend's house.

8

Moreover, despite Ingram's exculpatory claims, there was evidence that he still had possession of the SUV when dealership employees left him voicemail messages to return it. Sweely testified that he called Ingram about 10 times before the dealership closed at 8 p.m. and left messages informing Ingram that he needed to bring the vehicle back otherwise police would become involved. Ingram testified that he called Shaw within an hour of Greeno driving away from the gas station. And Shaw explained that this call occurred between 9 and 10 p.m. Based on this timeline, Ingram still possessed the SUV when Sweely repeatedly demanded return of the vehicle and, furthermore, Ingram could not have returned the vehicle before the dealership closed. In a light most favorable to the State, the evidence shows that Ingram exercised control over the vehicle for hours longer than permitted by the dealership. As a result, there is sufficient evidence that Ingram exerted unauthorized control over the SUV without the owner's consent.

Ingram next concedes that if he intended to temporarily deprive Don Hattan Chevrolet of the use or benefit of the vehicle, the State failed to prove he did so "with criminal intent." Ingram suggests a person always intends to temporarily deprive a dealership of the use or benefit of a vehicle when that person takes a test drive.

But neither an authorized test drive nor the mere intent to temporarily deprive an owner of the use or benefit of property constitutes criminal deprivation of property. Instead, the crime also requires a person to commit the actus reus of "obtaining or exerting unauthorized control over property." K.S.A. 2018 Supp. 21-5803(a); see *State v. Hood*, 297 Kan. 388, 393, 300 P.3d 1083 (2013). In this case, the State presented evidence that Ingram committed the actus reus of exerting unauthorized control over the vehicle with the requisite culpable mental state of intent to temporarily deprive the owner of the use of the vehicle. See K.S.A. 2018 Supp. 21-5202(b) (culpable mental states include intentional conduct, knowing conduct, and reckless conduct).

9

In a light most favorable to the State, the evidence showed that Ingram had permission to test drive the SUV for 20 minutes. Ingram, however, exerted unauthorized control over the vehicle when he refused to return it more than eight hours after the test drive began and after employees repeatedly demanded that he return the vehicle. And the evidence showed that Ingram acted with the requisite mens rea by exerting unauthorized control with the intent to temporarily deprive Don Hattan Chevrolet of the use or benefit of the vehicle. Accordingly, sufficient evidence supports Ingram's conviction of criminal deprivation of property.

*Felony Status of Ingram's Crime*

Finally, Ingram contends that his felony conviction for criminal deprivation of property must be reduced to a misdemeanor offense because the State failed to prove that his criminal history included two prior convictions for criminal deprivation of a motor vehicle. Ingram argues that two prior convictions for criminal deprivation of a motor vehicle is an element of the felony offense, which the State needed to prove to the jury.

Under K.S.A. 2018 Supp. 21-5803(b)(1)(A), criminal deprivation of a motor vehicle is classified as a misdemeanor offense for a defendant's first two convictions of the crime. However, criminal deprivation of a motor vehicle is a "severity level 9, nonperson felony upon a third or subsequent conviction." K.S.A. 2018 Supp. 21-5803(b)(1)(A)(ii).

In this case, the charging document alleged that Ingram's crime was a felony offense because he was previously convicted of criminal deprivation of a motor vehicle in two separate 2017 cases. At the preliminary hearing, the State introduced into evidence journal entries from these 2017 cases, which showed that Ingram had two prior convictions for criminal deprivation of a motor vehicle. As a result, Ingram was bound

10

over on the felony charge. Importantly, the same judge who was present at the preliminary hearing also presided over Ingram's trial and imposed his sentence.

Contrary to Ingram's reasoning: "Prior convictions under a self-contained habitual criminal statute are not elements of the offense charged and are pertinent only to the sentence that will be rendered in the event of a conviction." *State v. Rome*, 269 Kan. 47, Syl. ¶ 4, 5 P.3d 515 (2000), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Our Supreme Court has long recognized a distinction between crimes requiring a prior conviction as a necessary element, and crimes in which prior convictions of the same crime are considered when classifying the current conviction. See *State v. Loudermilk*, 221 Kan. 157, 159, 557 P.2d 1229 (1976). The *Loudermilk* court concluded that a prior conviction is a necessary element of a crime only when it is included in the *statutory definition of the crime* rather than in the *penalty section* of the statute. 221 Kan. at 160.

K.S.A. 2018 Supp. 21-5803(a) defines the crime of criminal deprivation of property as "obtaining or exerting unauthorized control over property, with intent to temporarily deprive the owner of the use thereof, without the owner's consent but not with the intent of permanently depriving the owner of the possession, use or benefit of such owner's property." The statutory definition of the crime includes no requirement that the defendant was convicted of any prior offense. Instead, the language referring to a defendant's prior convictions is exclusively within the penalty section of the statute. K.S.A. 2018 Supp. 21-5803(b). As a result, Ingram's prior convictions are not elements of the crime charged and served only to classify the crime at sentencing. See *State v. Hanks*, 10 Kan. App. 2d 666, 669, 708 P.2d 991 (1985) (holding that "proof of two prior theft convictions is not an element of class E felony theft defined by K.S.A. 1984 Supp. 21-3701").

Since a defendant's prior convictions for criminal deprivation of a motor vehicle are not elements of the felony offense, the State was not required to prove the existence of Ingram's prior convictions to the jury. But the State did present sufficient evidence of Ingram's prior criminal history at the preliminary hearing to elevate his conviction for criminal deprivation of a motor vehicle to a felony. Accordingly, sufficient evidence supported Ingram's felony conviction for criminal deprivation of a motor vehicle even though the State did not present evidence of his prior convictions at trial.

Affirmed.