**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Barry Jay FELDMAN,**
**Defendant-Appellant.**

**No. 84–5142.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 1985.

Decided April 24, 1986.

As Amended May 23, 1986.

Ronald J. Nessim, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Barry Jay Feldman, in pro per.

Before FLETCHER, PREGERSON, and CANBY, Circuit Judges.

PREGERSON, Circuit Judge.

On May 5, 1983, a bearded man wearing mirrored sunglasses robbed the Security Pacific National Bank in Irvine, California of $2,585. The robber handed the teller a typed index card which stated: "This is a robbery. There is a gun in my case. Do not set off any alarm. Do as I ask." Six weeks later, City of Orange police officers arrested Barry Jay Feldman in a parking lot when he returned to a vehicle that had been identified as a stolen rental car. In searching the car, officers found a brief-

case containing a single index card bearing the same words as those used in the bank robbery, a toy pistol, a cloth bank bag and a pair of mirrored sunglasses. The bank teller subsequently identified Feldman as the robber from a "photospread."

A federal grand jury indicted Feldman for unarmed bank robbery. Following arraignment, Feldman elected to proceed *in propria persona.* The district court, *sua sponte,* twice dismissed indictments against Feldman because the government provided him inadequate access to a law library. He was brought to trial on a third identical indictment, found guilty by a jury, and sentenced to seven years' imprisonment. Feldman timely appealed raising nine constitutional and evidentiary errors. We affirm.

1. Excluding the 67 day period between Feldman's second indictment and second arraignment, the period between Feldman's first indictment and trial can only be reduced to less than seventy chargeable days by deducting thirteen days during which Feldman's pretrial motion for library access was pending in January 1983.

   Feldman filed two motions on January 12, 1984: "Ex parte application for order directing L.A. Sheriff to house defendant in pro per unit at L.A. County Jail"; and "Motion for due process and Sixth Amendment pro per rights" Both papers sought essentially to give Feldman access to a law library. The "ex parte application" was denied on January 13, 1984; the "motion" which is handwritten and was attached to the "ex parte application," was denied during a status conference on January 26, 1984. Denying the "motion," the court did not recall that it had been filed, but promptly denied it because it was "along the same lines" as the "ex parte application" which had been refused because Feldman was not then in federal prison. Feldman was in violation of state parole, and, pending his trial, he was held in the Los Angeles County Jail. He had been removed from the jail's "pro per tank," which has law library facilities, because he had advisory counsel from the Federal Public Defender's office.

   18 U.S.C. § 3161(h)(1)(F) excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." After a thorough review of the legislative history, we concluded that Congress intended the clock to stop for every pretrial motion. *United States v. Henderson,* 746 F.2d 619, 622–23 (9th Cir.1984), *cert. granted,* —— U.S. ——, 106 S.Ct. 225, 88 L.Ed.2d 224 (1985). A motion can be tangential to the issue of guilt and still trig-

## I. *Speedy Trial Act Claim*

Feldman argues that the United States failed to bring him to trial within the seventy days from indictment or arraignment mandated by the Speedy Trial Act ("the Act"), 18 U.S.C. § 3161(c)(1), and that the court should have dismissed his third indictment, 18 U.S.C. § 3162(a)(2). Feldman computes 147 chargeable days from his first arraignment until the beginning of his trial. Since we conclude that the *sua sponte* dismissals restarted rather than tolled the speedy trial "clock," and that fewer than seventy days elapsed between the third indictment and trial, we need not reach the government's assertion that sufficient days between the first indictment and trial were excludable to reduce the delay below seventy days.[1] We review fac-

ger the subsection. *See United States v. Savoca,* 739 F.2d 220, 223 (6th Cir.1984) (motion to reduce bond), *vacated in part on other grounds,* 761 F.2d 292 (6th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985). The key determination is whether the delay is due to a pretrial motion, not whether the motion causes a delay in reaching trial. *Henderson,* 746 F.2d at 622–23; *United States v. Stafford,* 697 F.2d 1368, 1371 (11th Cir.1983).

Feldman argues that the January 26 denial should be referred back to the January 13 denial, because it was then that the judge apparently would have denied the "motion" had he been aware of it. Alternatively, he argues that the "motion" should properly have been titled "ex parte application" under Central District of California Local Rules. *See United States v. Novak,* 715 F.2d 810, 815 (3d Cir.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984) ("Congress urged that any exclusions allowed under [18 U.S.C. § 3161(h)(1)(F) ] be guided by local court rules governing motions practice.") The Local Rules do not provide for an "ex parte motion." Feldman asserts that ex parte motions do not fall within the statutory phrase "pretrial motion," and that the effect of characterizing ex parte motions in this way would be that the speedy trial clock would never run to seventy days because of the pervasive frequency of ex parte motions before a criminal trial.

Because we hold that the *sua sponte* dismissals of Feldman's prior indictments restart the speedy trial clock, and that less than seventy days elapsed between Feldman's third indictment and arraignment and his trial, we need not decide the proper characterization of ex parte motions for speedy trial counting purposes.

tual issues concerning Speedy Trial Act disputes for clear error by the district court. *United States v. Henderson,* 746 F.2d 619, 622 (9th Cir.1984), *cert. granted,* — U.S. —, 106 S.Ct. 225, 88 L.Ed.2d 224 (1985). Questions of law concerning the Act are reviewed *de novo. Id.*

### A. Trial Court's Sua Sponte Dismissals.

If an indictment is dismissed on the defendant's motion, and the defendant is later reindicted for the same offense, the Act's seventy day "clock" begins anew. 18 U.S.C. § 3161(d)(1). However, if a government motion prompts dismissal of the indictment, and the defendant is later reindicted for the same offense, the original seventy day period is tolled only for the period between dismissal and reindictment or rearraignment, whichever is later. 18 U.S.C. § 3161(h)(6).[2] Here, the two dismissals without prejudice were on the district court's own motion. Neither the plain words of the Act nor any present case law indicate the effect of a *sua sponte* dismissal on the seventy day clock.

Feldman relies on *United States v. Dennis,* 625 F.2d 782 (8th Cir.1980) and *United States v. Harris,* 724 F.2d 1452 (9th Cir. 1984). Neither case is on point. In *Dennis,* the court dismissed one count *sua sponte,* then granted a continuance to allow the government to consider an appeal. Subsequently, the grand jury reindicted Dennis who claimed that, for speedy trial purposes, the seventy days began on the first indictment. The Eighth Circuit concluded that the district court properly decided that the ends of justice served by the continuance outweighed Dennis' speedy trial interests, and that, therefore, the period of delay resulting from the continuance was excludable. 625 F.2d at 794. *See* 18 U.S.C. § 3161(h)(8)(A). The court did not address whether the *sua sponte* dismissal tolled or reset the speedy trial clock.

In *Harris,* the defendant sought dismissal with prejudice of a pending prior indictment after arraignment on a superseding indictment. The panel affirmed the granting of the government's request to dismiss the prior indictment without prejudice but reversed on another speedy trial issue. 724 F.2d at 1454–55. Feldman asserts that *Harris* holds that a dismissal without prejudice is a government-initiated motion. While this was true in *Harris* because the government successfully moved to have the court's dismissal made into a dismissal without prejudice, the situation is not the same in our case. Indeed, here, the government strongly opposed any dismissal of Feldman's first two indictments.

Feldman further argues that, since the government's actions in persistently refusing to provide him with legal research facilities precipitated the *sua sponte* dismissals, the time delay caused by the need to reindict twice should be charged to the government. The government contends that it vigorously opposed the dismissals and that, because of section 3161(h)(6)'s narrow limitation to dismissals "upon mo-

---

**2.** Feldman argues that the 67 day period between his second indictment and second arraignment should be chargeable. He relies on *United States v. Arkus,* 675 F.2d 245, 247 (9th Cir.1982) where the court held that the speedy trial clock was tolled from the date of dismissal on the government's motion until reindictment, rather than rearraignment. The *Arkus* opinion was not explicit in choosing reindictment over rearraignment. Moreover, in *Arkus,* the choice of date made no difference to the applicability of the seventy day limit. 18 U.S.C. § 3161(h)(6) states that after a dismissal on the government's motion the clock resumes running on "the date the time limitation would commence to run as to the subsequent charge had there been no previous charge." This apparently refers to 18 U.S.C. § 3161(c)(1) which starts the clock for a first indictment at the indictment or arraignment, whichever is later. Thus, if the second charge is to be counted as if the first charge never existed, the clock must resume running on rearraignment if it is later than reindictment. This is the view taken by other courts. *See United States v. Rodriguez-Restrepo,* 680 F.2d 920, 921 (2d Cir.1982) (per curiam); *United States v. Cova,* 580 F.Supp. 588, 590 (N.D.Ind. 1984); *United States v. Scott,* 557 F.Supp. 990, 995 & n. 15 (N.D.W.Va.1983).

tion of the attorney for the Government," the tolling provision of the subsection cannot apply here. The government's position is consistent with courts' reluctance to extend section 3161(h)(6) beyond its literal wording. *See, e.g., United States v. Bounos,* 730 F.2d 468, 470–71 (7th Cir.1984) (Government need not have good faith basis for dismissing indictment).

We think it significant that section 3161(d)(1) requires restarting the clock where the indictment "is dismissed upon motion of the defendant, *or any charge contained in a complaint filed against an individual is dismissed or otherwise dropped.*" (Emphasis added.) The two disjunctive clauses, with their passive construction, suggest that the subsection applies to any manner of dismissal of an indictment except on the government's own motion, presumably including a *sua sponte* dismissal.

The legislative history offers only marginal guidance. The government draws attention to certain explanatory comments which state that 18 U.S.C. § 3161(d)(1) was intended to give the government time to prepare a further indictment when the "case has previously been dismissed on non-speedy trial grounds." S.Rep. No. 1021, 93rd Cong., 2d Sess. 33 (1974). This may suggest that any non-government-inspired, non-speedy trial-based dismissal is charged to the defendant and restarts the clock. However, this conclusion is placed into doubt by this court's recognition that Congress intended that "the courts and the government, not the defendant, assume primary responsibility for ensuring that criminal trials proceed expeditiously." *United*

*States v. Pollock,* 726 F.2d 1456, 1464 (9th Cir.1984).

There can be no doubt that Feldman was the beneficiary of the *sua sponte* dismissals, even though he opposed the second dismissal because it was not with prejudice. The result of the dismissals was to free him from custody, and to force the government unexpectedly to prepare a new indictment. Thus, the effect of the dismissals is the same as if the court had acted on Feldman's motion. This outcome of the court's action, when taken with the fragmentary indications from the statute itself and from the legislative history, indicates that the *sua sponte* dismissals here should be treated as if they were on Feldman's motions, thus restarting the clock at seventy days on each reindictment and rearraignment.

Since fewer than seventy days elapsed between Feldman's third indictment and arraignment and the beginning of his trial, the district court correctly denied Feldman's motion to dismiss on speedy trial grounds.

## II. *Fourth Amendment Claim*

Feldman was originally arrested for auto theft when he returned to the stolen rental car. The police, who had "staked out" the vehicle, knew that Feldman had rented the car, that he was in violation of state parole, and that he had a conviction record.[3] The officers arrested Feldman when it was clear that he intended to attempt to take the car from the lot. The officers handcuffed Feldman at gunpoint a few feet from the car. Feldman had not entered the vehicle which remained locked.[4]

---

**3.** The government suggests that Feldman had "a record for armed robbery." In fact, although Feldman had once been arrested for armed robbery, he had never been charged with armed robbery. Feldman had prior convictions for burglary, extortion, and false imprisonment. However, the officers were aware that Feldman's extortion and false imprisonment convictions resulted from a crime in which Feldman held the family of a bank manager at gunpoint

in their home in an attempt to force the manager to turn over bank funds to Feldman.

**4.** An employee of the rental company had earlier immobilized the car in the parking lot. Feldman was never charged with theft of the car, although there is no doubt that, on the basis of the information then available to them, the police officers had probable cause to arrest Feldman for auto theft. Apparently, he had signed a

The arresting officer's affidavit states that his colleague had earlier looked through the car windows and seen "an empty gun holster,"[5] clothing and a zippered briefcase. The officers patted Feldman down and asked him where the gun was. Feldman then told the officers of the toy gun in the briefcase. Detective Manavian testified: "At that moment, I intended to conduct an inventory search.... It was my option to conduct this inventory search at the scene or wait until the car was taken to an impound lot. I chose to search the car at the [scene] because I was concerned about the possibility that there was a weapon in the car. Despite Feldman's statement about a toy gun, there was a fair chance of a real weapon because of the holster and Feldman's prior criminal history." Detective Manavian took the keys from Feldman and searched the car, opening the briefcase. Manavian then "took all the personal property taken from the car back to the Orange Police station, where [he] filled out the property report." The car was later returned to the rental company.

The government argues that the evidence found in Feldman's briefcase was seized pursuant to a valid warrantless inventory search. It further argues that, even if the search was not a lawful inventory search, the warrantless search was legal as an automobile search. Alternatively, the government argues that the search was legal because Feldman had no reasonable expectation of privacy in the briefcase, or that its contents would inevitably have been discovered, or that the officers acted in good faith. The district court found as follows:

> It appears to me that there was probable cause for the arrest. The search could have been incident to the arrest. It does

not appear that was the rationale, however, according to the witnesses themselves, where one witness in particular said there wasn't a search for safety, the officer's own safety, and whether it is an inventory or some other kind of search is unimportant. It was a valid search. The motion to suppress is denied.[6]

### 1. Standard of Review

█ We uphold a district court's findings of fact at a suppression hearing unless they are clearly erroneous. *United States v. Snowadzki,* 723 F.2d 1427, 1429 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 140, 83 L.Ed.2d 80 (1984). Feldman argues that the district court's findings of fact are so inadequate that we must review his motion to suppress *de novo. United States v. Bates,* 533 F.2d 466, 468 (9th Cir.1976). The only substantive finding made here by the district court was that the search was lawful. The ultimate issue of lawfulness of the search presents a mixed question of law and fact which we review *de novo. United States v. Jarrad,* 754 F.2d 1451, 1454 (9th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985).

### 2. Inventory Search

In *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the Supreme Court validated a warrantless inventory search of a car impounded for multiple traffic violations. The Court upheld the search as "a protective inventory of a car lawfully within police custody ... a caretaking search of a lawfully impounded automobile." *Id.* at 375. *Opperman* identified three rationales for an inventory search: to protect the owner's property in police custody; to protect the police against claims for lost property; and to protect the

---

second open rental agreement using a credit card, and thus the rental company's allegation that the car was stolen may have been incorrect. Since we conclude that the search of the rental car was valid in any event, we need not resolve any questions of standing that arise from the fact that the car may have been stolen.

5. At oral argument, Feldman admitted that there was a holster in the car at the time of his arrest.

6. On appeal, the government does not argue that the search was incident to Feldman's arrest.

police and community from potential danger. *Id.* at 369. *See also Cooper v. California,* 386 U.S. 58, 61–62, 87 S.Ct. 788, 790–91, 17 L.Ed.2d 730 (1967) (valid inventory search after police impounded Cooper's car pending forfeiture proceedings); *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (valid inventory search of the car's contents after police impounded car because seen at robbery site); *Cady v. Dombrowski,* 413 U.S. 433, 447–48, 93 S.Ct. 2523, 2530–31, 37 L.Ed.2d 706 (1973) (valid search when police impounded and inventoried car in remote rural area when owner's service revolver had not been recovered and was believed to be in the car); *United States v. Scott,* 665 F.2d 874, 876–78 (9th Cir.1981) (valid search when officer followed written police inventory procedures after vehicle could not be secured following driver's arrest).[7]

Like *Opperman,* each of these cases involved a standard local police procedure inventory search of an impounded car.[8] The Orange Police Department has no written procedure for inventory searches. Officers are instructed that stolen vehicles must be impounded and their contents inventoried on a standard printed form. However, the Department gives complete discretion to its officers to decide when and where to inventory the contents of the stolen vehicle. Feldman argues that, under the logic of *Opperman,* Orange's laissez-faire "standard inventory procedure" precludes Orange police officers from ever conducting a constitutional warrantless inventory search. *See* 2 W. LaFave, *Search and Seizure* § 7.4 at 576 (1978) ("What is needed in the vehicle inventory context, then, as is true of many other types of inspections or regulatory searches, is not probable cause, but rather a regularized set of procedures which adequately guard against arbitrariness." (footnotes omitted)).

The government relies on *Cady* to argue that the Orange procedure is adequate under *Opperman* in appropriate circumstances. *Cady* "is not really an inventory case; rather, it is a case of a warrantless search on probable cause for the purpose of ensuring that a weapon did not fall into the wrong hands." 2 LaFave, *supra,* § 7.4 at 582–83. In *Cady,* the police had reason to believe that Dombrowski's service revolver was in his disabled car in a remote rural area of Wisconsin. 413 U.S. at 443, 93 S.Ct. at 2529.

The police towed the car to a place of safe keeping to inventory the contents and search for the gun, in accordance with standard police procedure. *Id.*

The purpose of the search of Feldman's car to search for a gun is the same as that

---

**7.** Feldman draws attention to the law in California prior to June 1982 which held that an inventory search of the contents of a vehicle not in plain view is unlawful absent either a warrant or exigent circumstances. *Mozzetti v. Superior Court,* 4 Cal.3d 699, 711–12, 484 P.2d 84, 92, 94 Cal.Rptr. 412, 420 (1971). In Proposition 8, California voters instructed the state's courts to apply federal constitutional standards in deciding whether evidence should be excluded at trial. "What Proposition 8 does is to eliminate a judicially created *remedy* for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled." *In re Lance W.,* 37 Cal.3d 873, 886–87, 694 P.2d 744, 752, 210 Cal.Rptr. 631, 639 (1985) (emphasis in original). We consider the search under federal constitutional law only.

**8.** *Opperman* emphasized that cars carried a lesser expectation of privacy than other personal belongings. 428 U.S. at 367, 96 S.Ct. at 3096. In *United States v. Monclavo-Cruz,* 662 F.2d 1285, 1289 (9th Cir.1981), we held that "the community caretaking functions of the police are usually well served by simply inventorying personal baggage as a unit without searching it." In *Monclavo-Cruz,* the court held that a purse carried by the arrestee could not be searched without a warrant. The court did not address "under what circumstances routine inventory searches would be lawful under *Opperman.*" *Id.* at 1289 n. 2. In *Monclavo-Cruz,* however, we were careful to note that "the police had no reason to believe that the purse contained weapons or explosives." *Id.* at 1289.

held sufficient in *Cady*. The timing and place of the searches differ—Detective Manavian searched Feldman's car "on-the-spot" when he arrested Feldman[9]; the police towed Dombrowski's car to a private garage and searched it there. We think the similarity of purpose—securing a gun reasonably believed to be in the car—between the search in *Cady* and Manavian's search here is more significant than the dissimilarity of search location between the two cases. As the Fifth Circuit has observed, "[i]t is increasingly common practice for police to conduct inventory searches of vehicles incident to their impoundment." *United States v. Prescott*, 599 F.2d 103, 105 (5th Cir.1979). Detective Manavian's behavior after suspecting that Feldman had a live gun in the car almost exactly duplicates that of the officer in *Prescott*. When Prescott was arrested for drunk driving, officers saw a pistol and bullets in plain view. The bullets did not fit the pistol found, so the officer searched the pick-up, finding the gun protruding from a suitcase behind the driver's seat. *Id.* The inventory search was upheld: "[i]f an inventory search is otherwise reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other evidence may be found." *Id.* at 106. The *Prescott* search was held reasonable despite the absence of standard police procedures because searching for a weapon that an officer believes to be in the car is " 'standard police practice' in the sense that it was of the type repeatedly recognized by the courts as efficacious and constitutionally reasonable. More importantly, however, it was action necessitated by special concerns for public safety." *Id.*

In *Prescott*, the Fifth Circuit considered irrelevant the content of the local police inventory procedure, and whether the officer acted in conformity with that procedure, given the potential existence of a gun in the vehicle. As *Prescott* sensibly concluded, swift and effective action by an officer to secure a gun which he or she reasonably believes to be in an empty impounded car should be recognized as "standard police procedure" for inventory search purposes as much as the rote adherence to established written inventory procedures validated in *Opperman*. This recognition that a broader approach to inventory search requirements is appropriate where public safety is involved mirrors the Supreme Court's similar recognition of a public safety exception to the *Miranda* rule. *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 2632, 81 L.Ed.2d 550 (1984).[10]

■ Feldman also draws attention to Manavian's original police report which states that the search was "due to the subject's parole status as well as the ve-

---

9. Manavian's affidavit makes clear that he recognized that instead of searching the car immediately, he could impound the car and conduct an inventory search at the police lot. With the benefit of hindsight that the car contained only a toy gun, it may be that impounding and towing would have been a preferable means of ensuring that the car was not vandalized (four officers were present at Feldman's arrest). Indeed, the car was, in fact, taken to a police station after the search. Similarly, Manavian might have inventoried the closed briefcase containing the toy gun rather than rifling through its contents.

10. This court has indicated that, in certain exceptional circumstances, a valid inventory search need not necessarily include both an impoundment and a formal local inventory procedure. *United States v. Scott*, 665 F.2d 874 (9th Cir.1981). Police officers stopped Scott's car for a registration violation, and then arrested Scott on discovering an outstanding misdemeanor warrant. Scott refused to permit the car's impoundment, and the car's doors and windows could not be secured. *Id.* at 875. The officers saw a check in plain view in the car, and decided to conduct an inventory search in strict accordance with written police procedures. *Id.* at 877. Despite the absence of an impoundment of the car, the inventory search was upheld. *Id.*

The public safety concern which we recognize here to uphold the search of Feldman's rental car, like that in *Quarles, Cady* and *Prescott*, relates only to an officer's reasonable belief that the vehicle (or supermarket in *Quarles'* case) contained a gun which ought to be secured immediately. That belief makes it unnecessary for the officer to have been relying on the kind of explicit departmental regulation that supported the search in *Scott*.

hicle being a reported stolen." Apparently, the first mention of an inventory search appears in Manavian's affidavit for the suppression hearing. An inventory search will not be sustained where the court believed that the officers were searching for incriminating evidence of other offenses. *See Opperman,* 428 U.S. at 376, 96 S.Ct. at 3100; *Scott,* 665 F.2d at 876.

Thus to uphold Manavian's actions as a lawful inventory search, we must answer three questions affirmatively. First, whether Orange's decision to give discretion to police officers in deciding the place and timing of inventory searches satisfies the "standard local procedure" requirement of *Opperman* and *Cady.* Second, whether, in the circumstances, Manavian's decision to search immediately for the gun rather than inventory the car at the police lot conformed to this procedure. Third, whether the search was motivated by a concern to inventory the car's contents rather than to search for other incriminating evidence.

■ The question is close, but we conclude that, in the particular circumstances confronting Detective Manavian, the search was a lawful inventory of the car's contents. *Opperman* and subsequent cases such as *Scott* require the existence of a standard police inventory procedure to justify a warrantless inventory search. Orange has a standard procedure that all stolen vehicles are to be inventoried. However, Orange's procedure is limited in timing and location only by the scope of the officer's discretion. As the Supreme Court indicated in *Cady,* 413 U.S. at 448, 93 S.Ct. at 2531, and as the Fifth Circuit concluded

in *Prescott,* 599 F.2d at 106, to conduct an on-the-spot inventory search of a car which an officer reasonably suspects may contain a gun is reasonable because it ensures the immediate protection of the public's safety. Manavian's decision to conduct an on-the-spot inventory of the rental car was reasonable given Feldman's statement about a toy gun, Feldman's conviction record and parole violation, the presence of the holster in the car and the absence of any reason for Manavian to link Feldman to another crime. In these circumstances, and we rule upon no other, the inventory search of the briefcase was valid. We thus affirm the district court's denial of Feldman's motion to suppress.[11]

### III. *Miranda Claim*

■ When arrested in the parking lot, Feldman initially gave a false name to the officers. It is not disputed that the officers had not then read Feldman his *Miranda* rights. This misidentification was used against Feldman in the government's closing argument at trial as an indicator of a guilty mind. Feldman argues that the court should have suppressed his misidentification.[12] We have upheld a district court's findings of fact in a suppression hearing involving a *Miranda* claim on a clearly erroneous standard. *United States v. Booth,* 669 F.2d 1231, 1235 (9th Cir. 1981). Whether an inquiry of a person in custody constitutes interrogation was held to be a question of fact. *Id.* at 1238.[13] "[C]ustodial questioning constitutes interrogation whenever, under all the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.'"

---

**11.** Since we uphold Manavian's actions as a valid inventory search, we need not reach the government's alternative justifications for the search.

**12.** The government stipulated that Feldman's statement to Manavian about the toy gun in the car was barred by *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), and that statement was not used at trial.

**13.** The standard of review stated in *Booth* is placed into doubt by *United States v. McConney,*

728 F.2d 1195, 1201–04 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *see United States v. Gonzalez-Mares,* 752 F.2d 1485, 1489 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985). Arguably whether an inquiry is interrogative is a mixed question of law and fact and reviewed *de novo. McConney,* 728 F.2d at 1202–03. The law in this circuit is clear that questions concerning identity are generally not interrogative, so that Feldman's *Miranda* claim fails under either standard.

*Id.* at 1237 (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980)).

*Booth* concluded that "[o]rdinarily, the routine gathering of background biographical data will not constitute interrogation," *id.* at 1238, and sanctioned questions about Booth's identity, age and residence, while suppressing questions about prior arrests and other potentially incriminating matters. *Id.; see also United States v. Gonzalez-Mares,* 752 F.2d 1485, 1489 (9th Cir.) (no violation where questions of identity "not directly related to the facts of the crime with which appellant was then charged"), *cert. denied,* —— U.S. ——, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985). Manavian's question to Feldman seeking his name was not aimed at eliciting a criminal response, but merely at corroborating the information made available to the police by the rental agency. The question itself was not a breach of Feldman's *Miranda* rights.

## IV. *Sixth Amendment Claim*

The court prevented Feldman from extended cross-examination of the teller—the only identification witness—designed to establish that the photospread was impermissibly suggestive. Feldman argued that his was the only picture that exactly fitted the teller's description of the robber, and sought to establish the teller's perceptions on each photo. He claims that the judge's curbing of this cross-examination violated his Sixth Amendment rights under *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

■ We will uphold a district court's decision on the extent of cross-examination unless it constitutes an abuse of discretion. *United States v. Kennedy,* 714 F.2d 968, 973 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984). A defendant's constitutional right to cross-examination is limited to issues relevant to the trial. *Id.* However, a restriction of cross-examination may still be error if sufficiently prejudicial. *See United States v. Brady,* 561 F.2d 1319, 1320 (9th Cir.1977) (per curiam). The trial court does not abuse its discretion as long as the jury receives sufficient information to appraise the biases and motivations of the witness. *Kennedy,* 714 F.2d at 973.

■ Feldman had been permitted to pursue unhindered a similar line of questioning of the FBI agent who designed the photospread. His first two questions to the teller were rejected *sua sponte* by the court, and Feldman abandoned further similar inquiry. The jurors do appear to have been made aware of Feldman's theory concerning the bias of the photospread both from his prior cross-examination of the FBI agent. *See United States v. Lester,* 749 F.2d 1288, 1300 (9th Cir.1984); *United States v. DeLuca,* 692 F.2d 1277, 1282 (9th Cir.1982). The teller also identified Feldman in court. Together, these were sufficient "facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis,* 415 U.S. at 318, 94 S.Ct. at 1111.

## V. *Government Expert*

■ The court permitted the government to qualify FBI Agent Ibbotson as a "bank robbery expert" and denied Feldman the opportunity to voir dire Ibbotson on his statistical qualifications. We review a district court's decision to admit expert testimony for an abuse of discretion. *United States v. Falsia,* 724 F.2d 1339, 1341 (9th Cir.1983).

■ Ibbotson was permitted to testify that, in his experience of two hundred robberies, surveillance cameras in the robbed bank worked about fifty per cent of the time, and fingerprints were recovered less than five per cent of the time. Feldman asserts that the government introduced this testimony to forestall Feldman's use of the absence of any such probative evidence here. *See United States v. Hall,* 653 F.2d 1002, 1007 (5th Cir.1981) (error to admit quasi-expert testimony whose "sole purpose was to inform the jury that it need not view the absence of corroborating physical

evidence as a weakness in the government's case.").

Asking an FBI agent questions calling for expert opinions during direct testimony is not an uncommon procedure. Similarly, drawing the "sting" from the opposing party's anticipated arguments through the presentation of one's own case is a standard and proper litigation technique. Moreover, even if Ibbotson's "expert" testimony raised the concerns indicated in *Hall*, it is difficult to conclude that this error alone was fatally prejudicial to Feldman. He could place his negative inference concerning the absence of photographic or fingerprint evidence against him before the jury and leave them to draw appropriate conclusions. Moreover, the search and identification evidence against Feldman is sufficiently direct and powerful that any error in refusing to permit voir dire was harmless error at worst. *See United States v. Valle-Valdez*, 554 F.2d 911, 916 (9th Cir. 1977) ("non-constitutional errors are measured against the more-probable-than-not [that the error materially affected the jury verdict] standard").

## VI. *Modified Flight Instruction*

■■■ The court instructed the jury that Feldman's change of appearance in shaving off his beard shortly before trial[14] "may be considered by the jury in light of all other evidence in the case in determining guilt or innocence." The judge misread the instruction to the jury, referring to *"the* defendant's intentional change of his appearance" rather than *"a* defendant's intentional change of his appearance," and declined to correct the slip.[15] Feldman attacks both the instruction and the manner in which it was given. Jury instructions' adequacy is determined by examining them in their entirety. *United States v. Harris*, 738 F.2d 1068, 1072 (9th Cir.1984). We review a district court's decision to submit the instructions for abuse of discretion. *Id.*

■■■ The government justifies the instruction from the facts that: the robber had a beard; Feldman had a beard when arrested; the teller identified Feldman from a bearded photo; Feldman was clean shaven at the trial; and Feldman presented no evidence that he had no beard on the day of the robbery. A flight instruction is valid only when the links along the extended chain of inference from the defendant's behavior to actual guilt of the crime charged are unbroken, and when the defendant's flight reaction is immediate to the crime. *See Morris v. United States*, 326 F.2d 192, 195 (9th Cir.1963); *United States v. Myers*, 550 F.2d 1036, 1051 (5th Cir.1977) ("It is the instinctive or impulsive character of the defendant's behavior ..., that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses."); 22 C. Wright and K. Graham, *Federal Practice and Procedure*, § 5162 at 23–24 (1978).

■■■ The chain of references to support the flight instruction here was pitifully weak.[16] The total absence of immediacy in Feldman's behavior dissolves any remaining merit in the instruction. The court's failure to correct the mistake in the delivery of the instruction further compounded the error. However, despite the inappropriateness of the instruction, it is inconceivable that the instruction influenced the outcome of the trial, given the highly probative search and identification evidence against Feldman. Thus, we are convinced beyond a reasonable doubt that the instruc-

**14.** Feldman's mother gave uncontradicted testimony that her son shaved his beard "to please her" in March 1984, nine months after his first arrest for the robbery.

**15.** The written jury instruction used in the jury room during deliberations included the correct indefinite article wording.

**16.** The Assistant U.S. Attorney admitted at oral argument that, were he to try the case again, he would have omitted the flight instruction. The government had relied on *United States v. McKinley*, 485 F.2d 1059 (D.C.Cir.1973) to support the instruction, but, properly, does not cite it in its appellate brief. McKinley ignored an express court order not to shave prior to a physical line-up, thus justifying the modified flight instruction.

tion did not affect the verdict. *See Haddad v. Lockheed*, 720 F.2d 1454, 1457–59 (9th Cir.1983).

### VII. *Other Evidentiary Errors*

Feldman claims three further errors: first, that the court refused to admit a set of "scene cards," similar to the one card found in the car, which Feldman claimed were part of a TV script he was writing; second, that the court refused to permit three voir dire questions to jurors concerning attitudes toward violence in movies; and third, that the court admitted as evidence of motive that Feldman's bank account was overdrawn and that he had forged his father's signature on a check.

#### 1. *Scene Cards*

█ Feldman argued that he was writing a script for the television series "Simon and Simon" which included a bank robbery. His writing style was to sketch the plot on index cards. Feldman claimed that a full set of scene cards was in the car when Manavian searched it, but that the police only recovered the one card dealing with the robbery. Feldman offered a reconstructed set of fourteen cards he claimed were in the car, but the trial court refused to admit them because of insufficient authentication. We will uphold a district court's finding of sufficiency of authentication absent an abuse of discretion. *United States v. Spetz*, 721 F.2d 1457, 1476 (9th Cir.1983).

█ Feldman offered testimony that other paper items were in the car besides those articles inventoried by Manavian. Feldman's writing professor testified that he taught students to use index cards to sketch plots. Feldman argues that this is sufficient foundation to permit the introduction of the reconstructed scene cards under Fed.R.Evid. 1004(1), and that the judge's refusal to admit the cards was an implicit statement to the jury that he rejected the credibility of Feldman's version of the events.

Feldman relies on *United States v. Cambindo Valencia*, 609 F.2d 603, 633 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980), which upheld the introduction of a telephone number found on the defendant which had been noted on a police form by an officer who then mislaid the original. Here the judge did not have the benefit of a contemporaneously completed official document to verify the content of the scene cards, but only Feldman's asserted memory. Moreover, Feldman's foundation for the existence of the cards, their presence in the car, and their destruction by the police is sufficiently tenuous that to exclude the cards was well within the court's discretion.

#### 2. *Violence Voir Dire Questions*

█ Feldman claimed that a jury might be prejudiced by his occupation as a writer of movie scripts which "exploit graphic violence," and sought to exclude jurors with strong views on the matter through three voir dire questions. The trial judge conducted his own voir dire of jurors, and refused to ask them the questions on graphic violence. We review matters concerning the scope of voir dire questions for abuse of discretion. *United States v. Garcia*, 739 F.2d 440, 443 (9th Cir.1984).

█ The content of Feldman's writing, as depicted on the excluded scene cards for example, is not necessary in any way to Feldman's defense that the robbery card was one of an innocent set of scene cards in the car. The court's refusal to ask Feldman's voir dire questions could not have constituted an abuse of discretion. *Cf. Ham v. South Carolina*, 409 U.S. 524, 526–27, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973) (refusal to ask question about racial views in trial of black defendant is error); *United States v. Baldwin*, 607 F.2d 1295, 1297 (9th Cir.1979) (error to refuse voir dire questions on police credibility when this was crucial issue in case).

#### 3. *Motive Evidence*

The government introduced evidence, via a bank custodian, that Feldman's joint bank account with his father was overdrawn by

more than $8,000. On cross-examination by Feldman, the witness stated that Feldman's father had told the bank that his signature had been forged on the checks creating the overdraft. The court permitted the testimony as evidence of acts indicating motive under Fed.R.Evid. 404(b). The government also introduced an address book found in the car with the addresses of banks in the San Fernando Valley. Feldman argues that the custodian's answer concerning forgery was a trap set by the government to introduce prejudicial testimony, that the evidence generally on the joint bank account and address book was irrelevant and prejudicial that, since the defense was that Feldman was not the robber, motive was not an issue and motive evidence was improper.

■ A district court is accorded wide discretion in deciding to admit evidence under Rule 404(b). *United States v. Diggs,* 649 F.2d 731, 737 (9th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981). We review a district court's decision on the relevancy of evidence for abuse of discretion. *United States v. Burreson,* 643 F.2d 1344, 1349 (9th Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 125, 70 L.Ed.2d 106, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981). We review a district court's decision on balancing probative value against prejudicial harm under Fed.R.Evid. 403 for an abuse of discretion. *United States v. Rubio,* 727 F.2d 786, 798 (9th Cir.1983).

■ "Evidence that tends to show that a defendant is living beyond his means is of probative value in a case involving a crime resulting in financial gain." *United States v. Saniti,* 604 F.2d 603, 604 (9th Cir.) (per curiam), *cert. denied,* 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 384 (1979). The fact that Feldman owed substantial sums is therefore relevant. The reference to forged checks is more questionable. However, the admission came during cross-examination conducted by Feldman asking if the bank had notified the account holders

of the debt. The witness' answer is reasonably responsive, and Feldman offers no proof of collusion between the witness and the government. The list of bank addresses is similarly of doubtful relevance, especially since the actual bank robbed was some fifty miles from any bank listed.[17] The jury was free to assess the weight of this evidence, and it is doubtful whether any prejudicial effect so substantially outweighed the probative value as to make admission of the evidence an abuse of discretion.

Feldman relies on the holding in *United States v. Powell,* 587 F.2d 443, 448 (9th Cir.1978) that evidence of prior similar crimes is inadmissible evidence to show intent to commit a crime whose perpetrator's identity is unknown. "Rule 404(b) is an inclusionary rule—*i.e.,* evidence of other crimes [or acts] is inadmissible under this rule only when it proves nothing but the defendant's criminal propensities." *Diggs,* 649 F.2d at 737. This was precisely the situation in *Powell* where the government sought to use prior narcotics convictions to prove a narcotics charge. Here, the evidence of Feldman's impecunity shows simply that he had a motive to commit a robbery, not that he actually committed the robbery. It was within the judge's discretion to place that evidence before the jury.

## VIII. *Combined Error*

Finally, Feldman argues that the combination of errors by the court, even though each individual error may itself be harmless, requires reversal. *United States v. McLister,* 608 F.2d 785, 788 (9th Cir.1979). The potential errors on the flight instruction, voir dire, cross-examination, address book and bank custodian's testimony, even if taken together, must be regarded as harmless and unlikely to have materially prejudiced the jury given the highly incriminating evidence of the index card, toy gun, bank bag and sunglasses in Feldman's

---

**17.** The list included the names of the bank managers. Feldman had a prior conviction for extorting money from bank managers. *See supra*

note 3. If this was the purpose behind the list, it was irrelevant to the bank robbery charge.

briefcase and the identification of Feldman by the teller.

AFFIRMED.