Jeanie **RESLEY**, Plaintiff,

v.

Tim **HOLMES**, Russell County Sheriff, **Jim Wilson, and Scott Hagemeister,** Defendants.

No. 98–1252–JTM.

United States District Court, D. Kansas.

July 16, 1999.

Jim Lawing, Wichita, KS, for Plaintiff.

Michael T. Jilka, Wendell F. Cowan, Jr., Shook, Hardy & Bacon L.L.P., Overland Park, KS, Gerald L. Green, Gilliland & Hayes, P.A., Hutchinson, KS, for Defendants.

## MEMORANDUM ORDER

MARTEN, District Judge.

This a motion for summary judgment on the plaintiff Jeanie Resley's claims for excessive force, illegal search, and wrongful arrest. The defendants, members of the Russell County Sheriff's Department, have moved for summary judgment. The court has reviewed the pleadings and evidence submitted by the parties. For the reasons stated herein, the court will grant the defendants' motion.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show

there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

On the afternoon of July 26, 1996, Joseph Thielen and his wife came to the Russell County Sheriff's Department, and asked for assistance in retrieving their cattle. Thielen told Sheriff Tim Holmes that some of his cattle—three cows and two calves—were on Ken and Jeanie Resley's property, that some of the Resleys' cattle was on the Thielens' property, and that the Resleys would not give them back.

Holmes and County Attorney Krug telephoned Ken Resley at 4:30 p.m., and advised him they needed to exchange cattle. Resley responded that he needed to get his cattle from the Thielens. Holmes and Krug told Resley that Thielen would retrieve his cattle. They also told Resley that they would assist him in getting his cattle from the Thielens. They told Resley that if either one interfered, that person would be arrested for deprivation of property. Resley told Holmes that Thielen could pick up the cattle as long as he could get his back, too.

The exchange was set to take place in two hours. Holmes instructed his officers to keep the peace at the exchange, and to arrest any party who refused to return the other's cattle.

Thielen went to the Resley property on horseback and waited at the gate. Thielen was accompanied by a neighbor, Bruce Bohnen. Defendant Deputy Jim Wilson was in a marked patrol car. Jeanie Resley understood that Thielen came to retrieve his cattle. She drove up, got out of her vehicle, and came down across the dried-up part of the pond toward Thielen.

There is a dispute about how Resley behaved at the gate. According to the testimony of Thielen, Bohnen, and Wilson, Resley told Thielen "You fucking son of a bitch, you're not getting your cattle back!" (Def.Exh. 7, Thielen dep. at 19; Exh. 10, Wilson dep. at 21; Exh. 9, Bohnen Aff. at ¶ 5). Arriving at the gate, Resley sat down in front of it and held onto it. She refused to allow Thielen to come onto her property to get his cattle.

Wilson told Resley that if she did not let Thielen onto the property, he would arrest her. When she refused, Wilson arrested her, with the assistance of Deputy Scott Hagemeister. According to Resley "[i]t was not right he could keep my cattle and I had to open the gate and release his that night." (Resley dep. at 140). Resley has admitted she later stated that she was not going to allow Thielen onto her property until Thielen told her where her cattle were.

Resley admits she grabbed the fence with her hands. (Resley dep. at 43). She admits that she refused to permit Thielen to come onto her land to retrieve his cattle, that Wilson warned her he would arrest her if she did not, that it is standard policy to handcuff all arrestees, that her hands remained cuffed behind her for two or three minutes, and that she was re-cuffed in front after she complained. (Plf.Resp. at 2, admitting ¶¶ 9 – 14).

It is uncontroverted that, at the time of her arrest, Resley was on her property. However, as she concedes in the response, Deputy Wilson may have believed that she was on Thielen's property. She does deny using profanity at the scene. (Resley dep. at 146).

Resley does not controvert evidence showing that Wilson was instructed in his initial training on the proper way to put on

handcuffs. The response attempts to controvert Wilson's statement that he followed this procedure when he handcuffed Resley—placing one finger between the handcuff and the person's wrist. However, the response cites only page 45 of Resley's deposition in support of this denial. The cited passage states only that Resley remembers being handcuffed "[a]t first in back," and that this later changed. (Resley dep. at 45). Resley does not in her deposition state that the manner of Wilson's application of the handcuffs departed from established policy.

Resley admits that the handcuffs used on her are double-locked handcuffs, which prevents the handcuff from tightening up when placed on an individual.

Wilson held her at gunpoint for a minute or two until Hagemeister arrived. About a minute after she arrived in the area of the fence, she was handcuffed. Resley states that no words were spoken to her other than that she was under arrest, and that she said nothing to the deputies.

Resley was initially cuffed, for several minutes, with her hands behind her. Resley was then walked to a patrol car. She complained that the cuffs hurt her hands and shoulders, and, about 20 steps from the fence line, the deputies re-cuffed her with her hands in front. According to Resley, Wilson "dragged" her to the patrol vehicle by pulling on the chain of the handcuffs.

While Jeanie Resley was being taken into custody, Ken Resley drove through the pasture in his Suburban at a speed of more than 40 miles per hour. He stopped within five feet of the gate. At that time, Deputy Hagemeister was 15 to 20 feet away.

Hagemeister aimed his gun at the Suburban's windshield, ordered Resley to show his hands, and told him he was under arrest. Resley opened the door and said "Go ahead and fucking shoot me." Resley admits making the comment. He told Hagemeister that he could not arrest him because he was on his property, got back in his vehicle, and drove back to his house.

Jeanie Resley was then driven to jail by Hagemeister. Wilson then secured Jeanie Resley's vehicle, and saw a handgun on the passenger floorboard. He took the handgun into custody.

Resley phoned her husband from the jail. She did not ask her husband to call a doctor. Nor, during her time at the jail, did she complain of any medical problems to Sheriff Holmes. She was released from jail after posting a $50 bond. She was driven to her residence by a Dennis Saryerwinnie. The prosecutor ultimately dismissed the charges against Resley.

It is uncontroverted that Resley has not seen a doctor. In her response to the defendants' motion for summary judgment, as well as in the 21 various facts cited in support of her own summary judgment motion, Resley presents no evidence indicating that she suffered any particular injury from the incident.

### Conclusions of Law

The court finds that summary judgment is appropriate, and the defendant deputies are entitled to qualified immunity on the claim of false arrest. The defense of qualified immunity is designed not only to shield public officials from liability, but also to ensure that erroneous suits will not go to trial. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 806–08, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Pueblo Neighborhood Health Centers v. Losavio,* 847 F.2d 642, 645 (10th Cir.1988). When a public officer raises the defense of qualified immunity by a summary judgment motion, the plaintiff must make a twofold showing: that the officer's alleged conduct violated the law, and that the law was clearly established at the time. *Pueblo,* 847 F.2d at 646. In this context, the question is whether the deputies, particularly Deputy Wilson, had probable cause to believe that there were grounds for Resley's warrantless arrest. *Baptiste v. J.C. Penney Co.,* 147 F.3d 1252, 1255 (10th Cir.1998).

■ Under Kansas law, criminal deprivation of property occurs by "obtaining or exerting unauthorized control over property, with intent to deprive the owner of the temporary use thereof, without the owner's consent." K.S.A. 21–3705. It is uncontroverted that Thielen's cattle were on Resley's property. It is uncontroverted that Resley knew this. It is uncontroverted (see Def. Fact ¶ 9) that Resley refused to allow Thielen onto her property to retrieve his cattle.

The plaintiff's response essentially admits that Resley was refusing to return Thielen's cattle, making their return conditional on some sort of simultaneous exchange: "Plaintiff made clear to Mr. Thielen and the officers who arrested her that she would not permit Mr. Thielen to retrieve his cattle until satisfactory arrangements were made to bring her cattle to the place so the cattle could be exchanged." (Resp. at 7). The response also suggests that the matter could have been "settled in a civil action." Id.

■ These are indeed possible ways the standoff might have been resolved. But they have no bearing on the question of whether the plaintiff could have been understood by Deputy Wilson as having potentially committed a violation of K.S.A. 21–3705. That statute "contains four basic elements: (a) obtaining or exerting unauthorized control; (b) over property; (c) with the intent to deprive the owner of the temporary use thereof; and (d) without the owner's consent." *State v. Greene*, 5 Kan.App.2d 698, 702, 623 P.2d 933 (1981). Here, there is no question but that the cattle in question were "property," which is defined under 21–3110(16) as "anything of value, tangible or intangible, real or personal." There is no question that Thielen's cattle were on Resley's land. There is no question but that Thielen was not consenting to the continued detention of the cattle. *See Greene*, 5 Kan.App.2d at 703, 623 P.2d 933 (sheriff's order to leave a railroad leading to utility's property was "a clear expression of K.G. & E.'s lack of consent" for purposes of prosecution under K.S.A. 21–3705). And, finally, the plaintiff herself essentially admits that it was her intent to stop Thielen from retrieving his cattle until her condition (some form of simultaneous exchange) was met. The plaintiff's argument is an attempt to gloss onto the statute an additional element (the right to hold hostage the property of another until one's own property is first returned) which simply does not exist in the statute.

■ The defendants also seek summary judgment on the claim that plaintiff Resley was subjected to excessive force. The response brief submitted by plaintiff does not address the subject at length, which largely concerns itself with the plaintiff's argument that she should not have been arrested or that the gun should not have been removed from her vehicle. At the conclusion of the brief, plaintiff states that "both deputies were so new on the job they had not gone through the Kansas Law Enforcement Training Center's program," and subsequently the bare conclusion that "a submissible dispute exists about the degree of force the deputies used." (Resp. at 7).

The alleged lack of Kansas Law Enforcement Training Center training is not set forth in plaintiff's facts. In any event, it fails to note that the excessive force alleged in the present action—the allegedly abusive handcuffing—was a matter for which Deputy Wilson was trained. In her response, plaintiff expressly states that "it is admitted Deputy Wilson knew how to apply handcuffs." (Resp. at 2, ¶ 15).

Thus, there remains the bare allegation that excessive force occurred, and the facts as cited above. The Tenth Circuit has upheld dismissal of an excessive force claim based on facts more serious that the present case. In *Morreale v. City of Cripple Creek*, 113 F.3d 1246, 1997 WL 290976 (10th Cir.1997), the plaintiff Morreale was stopped by an Officer Mattys for running a stop sign and arrested when he determined her license had been suspended. She was handcuffed

with her hands behind her back according to standard procedure, despite Morreale's request that she be handcuffed with her hands in front to avoid aggravating a prior shoulder injury. As part of the handcuffing procedure, Mattys verified that two fingers' space remained inside the handcuffs so . that blood circulation would not be cut off, and he double locked the handcuffs so that they would not tighten down. He then ordered Morreale to get in the back seat of the police car for the fifteen to twenty minutes it took to verify that her passenger would be able to drive her car. Because the handcuffs hurt her wrists, Morreale asked to be allowed to stand outside until Mattys was ready to transport her, but Mattys refused. Mattys then drove Morreale two blocks to the Cripple Creek police department.

During the time she was handcuffed, Morreale complained that the handcuffs were digging into her wrists, but she complied with all Mattys's orders. She does not assert that Mattys pushed, shoved, or treated her roughly in any way. However, due to the cramped positioning in the back seat, Morreale had to sit on her hands, which caused the handcuffs to press into and scratch her wrists and to bruise her buttocks. She alleges that she continued to complain of the pain in her wrists on the way to the police department, and Mattys [sic] response was that she should not move around so much. She further states that she complained about the handcuffs's being too tight when she first arrived at the police department. Apparently, however, she did not complain of shoulder pain while she was handcuffed. As soon as they arrived at the police department, Mattys took Morreale to a holding cell and took off the handcuffs. Approximately twenty minutes elapsed from the time Morreale was first handcuffed until the time the handcuffs were removed.

1997 WL 290976, at *1 (footnotes and record citations omitted). The court conclud-ed Morreale had failed to demonstrate excessive force. The court wrote:

Attempting to demonstrate that Mattys used excessive force, Morreale. argues that she was a minor traffic offender who presented no threat or resistance. Therefore, she contends that, in light of her stated injury and repeated complaints that the handcuffs were digging into her wrists, Mattys' [sic] handcuffing her behind the back and requiring her to remain handcuffed in the cramped backseat of the patrol car for twenty minutes constituted excessive force under the circumstances. For purposes of summary judgment, we accept Morreale's version of events. Significantly, however, Morreale does not contend that Mattys used force which was substantial or abusive, nor does she dispute Mattys' [sic] claim that he took steps to assure that the handcuffs were not too tight. Lacking such allegations, she has made no claim for excessive force. *See Hannula v. City of Lakewood,* 907 F.2d 129, 132 (10th Cir. 1990); *cf. Palmer v. Sanderson,* 9 F.3d 1433, 1436 (9th Cir.1993) (denying qualified immunity for abusive handcuffing tight enough to cause bruising that lasted for several weeks, combined with officer's refusal to loosen handcuffs when arrestee complained of pain).

Accordingly, while we do not applaud the type of police insensitivity which Morreale alleges, those allegations standing alone do not establish a constitutional violation in this circuit. Therefore, the district court did not err in dismissing Morreale's action as to Mattys.

*Id.,* at *5–6 (footnotes omitted). *See also Hannula v. City of Lakewood,* 907 F.2d 129, 132 (10th Cir.1990) (dismissing similar claim noting that there was no evidence of substantial force or "of contusion, lacerations or damage to the bones or nerves of her wrists," and concluding "while loosen-

ing tight handcuffs may be the most compassionate action, the failure to do so does not rise to a clearly established constitutional violation").

In *Morreale,* the plaintiff was handcuffed with her hands behind her back for twenty minutes while being transported in a patrol vehicle. She alleged that the arresting officer ignored her request to handcuff her in front because of a shoulder injury, and ignored her complaints of pain in her wrists. She further complained that the incident injured both her shoulder and her wrist such that she could no longer pursue her professional career—playing the piano. In the present case, by contrast, Resley was handcuffed with her hands behind her for two or three minutes. When she complained the handcuffs were hurting her, the officers promptly switched her hands to the front. She did not have to ride in the patrol car with her hands cuffed behind her. She does not cite any evidence in her response brief demonstrating any serious injury to her shoulder or wrists.[1] As in *Morreale,* there is no evidence that the deputies used any other significant force against the plaintiff beyond the handcuffing. And, as in that case, the uncontroverted facts establish that Deputy Wilson followed standard procedure in applying the handcuffs, placing one finger between the handcuffs and the wrist.

1. Plaintiff denies the defendants' Uncontroverted Fact ¶ 18, which notes Resley's admission in her deposition that she has no shoulder complaints due to the incident. Plaintiff's response states the fact is "Denied. Ms. Resley has complaints also about her wrists, injured by Deputy Wilson and Deputy Hagemeister when they handcuffed her." Contrary to D.Kan.R. 56.1, the response cites not a single item of evidence in support of this denial. In her own statement of uncontroverted facts, Resley makes no allegation, and provides no evidence, of any injury to her shoulder or wrists.

2. There are some references, in the deposition excerpts submitted to the court, in which it appears that Resley has complained that, upon returning to her vehicle, she found it damaged. The court finds these references do not support a denial of summary judgment

In addition to seeking dismissal of these claims, the defendants also seek dismissal of the illegal search claim advanced by Resley, and seek dismissal of the action against Sheriff Holmes. Plaintiff presents no real argument on the second issue which would justify imposition of liability against the sheriff. As to the illegal search claim, from the response it appears that the sole issue is whether Deputy Wilson illegally removed Resley's handgun from her vehicle.[2] It is in this context that plaintiff suggests the proper course of action would have been for Deputy Wilson to have simply locked the vehicle, and gone to obtain a search warrant. Plaintiff argues that the deputy's entry into the vehicle cannot be justified as a search incident to an arrest, since by that time she was on her way to the local jail.

The problem for the plaintiff's position is that an officer's entry into a vehicle need not be justified solely on the grounds of a search incident to an arrest. Courts have upheld such entries where the entry or search was justified on the grounds of public safety. In the present matter, the uncontroverted evidence is that the (loaded) handgun which Resley had in her vehicle was on the passenger floorboard, visible to anyone standing outside the vehicle. Simply locking the vehicle would not alter

on the alleged illegal entry claim for two reasons. First, these references are buried in the deposition itself—the plaintiff's response makes no reference to them whatsoever in either the response to defendants' Statement of Uncontroverted Facts or in the plaintiffs' own Statement of Facts. Whether this is because the damage was not significant or for some other reason, the plaintiff has not presented those facts directly to the court as required by D.Kan.R. 56.1. Second, the evidence that it was the defendants who damaged the vehicle is not founded on admissible evidence. Resley states merely that, when she retrieved her vehicle from where it had been left on the side of the road, the interior had been disturbed. As to who caused the damage, she simply states: "It was officers, *I assume."* (Resley dep. at 181) (emphasis added).

this fact. The vehicle was parked near a public road.

In *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), the Court upheld the search of the trunk of a Ford Thunderbird, which at the time of the search had been towed to and was parked outside a small town garage. Police entered the trunk because, under the facts of the case, they had reason to believe a revolver was located inside. On entering the vehicle's trunk, they found evidence linking the driver to a murder.

The Court noted that "[a]lthough the trunk was locked, the car was left outside, in a lot seven miles from the police station to which respondent had been taken, and no guard was posted over it." 413 U.S. at 443, 93 S.Ct. 2523. The Court upheld the search as an effort to protect the safety of the public, rejecting the argument that a more reasonable practice would have been to post a guard on the vehicle:

> In *Harris [v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) ] the justification for the initial intrusion into the vehicle was to safeguard the owner's property, and in *Cooper [v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967),] it was to guarantee the safety of the custodians. Here the justification, while different, was as immediate and constitutionally reasonable as those in *Harris* and *Cooper*: concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle. The record contains uncontradicted testimony to support the findings of the state courts and District Court. Furthermore, although there is no record basis for discrediting such testimony, it was corroborated by the circumstantial fact that at the time the search was conducted Officer Weiss was ignorant of the fact that a murder, or any other crime, had been committed.
>
> While perhaps in a metropolitan area the responsibility to the general public might have been discharged by the posting of a police guard during the night,

what might be normal police procedure in such an area may be neither normal nor possible in Kewaskum, Wisconsin. The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable.

413 U.S. at 447, 93 S.Ct. 2523.

Subsequent cases have also applied the doctrine of a public safety search in cases involving firearms left in unattended vehicles. Thus, in *United States v. Wilson*, 2 F.3d 226, 233 (7th Cir.1993), *cert. denied*, 511 U.S. 1054, 114 S.Ct. 1615, 128 L.Ed.2d 341 (1994), holding that the search and removal of two handguns which were in plain view from a vehicle in an alley could be justified under several grounds, including "as a public safety measure, to prevent intruders from making off with them if the car were to be secured and left in the alley." Similarly, in *United States v. Prescott*, 599 F.2d 103, 105 (5th Cir.1979), the defendant was arrested for drunk driving, and officers found a pistol and bullets in plain view. They determined, however, that the bullets did not fit the pistol. The court upheld an inventory search of the vehicle to determine if there were any additional firearms, even though the search was not conducted according to standard inventory searches. The court concluded that the officers' actions were " 'standard police practice' in the sense that it was of the type that has been repeatedly recognized by the courts as efficacious and constitutionally reasonable. *More importantly, however, it was action necessitated by special concerns for public safety.*" 599 F.2d at 106 (emphasis added).

The Ninth Circuit followed *Prescott* in *United States v. Feldman*, 788 F.2d 544 (9th Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). The court recognized that a public safety search may be justified, even though it occurs outside the scope of established "inventory" searches:

In *Prescott*, the Fifth Circuit considered irrelevant the content of the local police inventory procedure, and whether the officer acted in conformity with that procedure, given the potential existence of a gun in the vehicle. As *Prescott* sensibly concluded, swift and effective action by an officer to secure a gun which he or she reasonably believes to be in an empty impounded car should be recognized as "standard police procedure" for inventory search purposes as much as the rote adherence to established written inventory procedures.... This recognition that a broader approach to inventory search requirements is appropriate where public safety is involved mirrors the Supreme Court's similar recognition of a public safety exception to the Miranda rule. *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 2632, 81 L.Ed.2d 550 (1984).

788 F.2d at 551.

In *United States v. Johnson*, 734 F.2d 503, 505 (10th Cir.1984), the court upheld an inventory search of a vehicle on similar grounds. The defendant had been removed from the vehicle after officers found him sitting in the vehicle, highly intoxicated, with a .357 magnum revolver in plain view. The court wrote:

> In the present case a search was further justified because of the presence of the revolver. A warrantless search of an automobile, including entering a locked trunk, was found to be reasonable in *Cady v. Dombrowski* in order to retrieve a revolver that would possibly "fall into untrained or perhaps malicious hands." *Id.*, at 443, 93 S.Ct. at 2529. Appellant's revolver in plain view clearly justified a search of the rest of the automobile for other weapons. Also, the presence of non-matching bullets in the passenger compartment would justify a suspicion that matching bullets may be found elsewhere in the automobile or another weapon. Because the inventory search was valid the incriminating items

discovered in the trunk were properly admitted as evidence.

734 F.2d at 505.

In the present case, the plaintiff's suggestion that her vehicle should have been simply locked, or that it should have been guarded until a search warrant obtained, is contrary to the law as it has developed since *Cady v. Dombrowski*. In that case the Supreme Court took into account the limited resources available to law enforcement in rural areas, and concluded that, when circumstances create a potential threat to public safety, officers need not wait to remove that threat. Specifically, they may immediately seek to protect the public from firearms left in unattended vehicles. The present case, in fact, presents a much stronger case for police entry into the vehicle than in *Cady*, since in that case the officers merely *suspected* a firearm might be located in the Thunderbird. Here, the plaintiff's handgun was *actually observed* by Deputy Wilson, and was left in plain view to any observer outside the vehicle, and that the vehicle was parked near a road. The court will grant the motion for summary judgment on the claim of an illegal search. The court holds as to the alleged illegal search, as with the claims of excessive force and illegal arrest, that the defendants are entitled to qualified immunity.

IT IS ACCORDINGLY ORDERED this 16th day of July, 1999, that the defendants' motion for summary judgment (Dkt. No. 51) is hereby granted.